**EDWARDS & HANLY,**
Plaintiff-Appellee,

v.

**WELLS FARGO SECURITIES CLEAR-
ANCE CORPORATION,**
Defendant-Appellant.

No. 606, Docket 78–7524.

United States Court of Appeals,
Second Circuit.

Argued Feb. 14, 1979.

Decided June 27, 1979.

William A. Masterson, Los Angeles, Cal. (Milbank, Tweed, Hadley & McCloy, New York City, and Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., of counsel), for defendant-appellant.

Evan L. Gordon, New York City (Delson & Gordon, New York City, and Wofsey, Certilman, Haft & Lebow, New York City, of counsel), for plaintiff-appellee.

Before MULLIGAN and GURFEIN, Circuit Judges, and POLLACK, District Judge.[*]

GURFEIN, Circuit Judge:

Plaintiff Edwards & Hanly ("E&H") sued Wells Fargo Securities Clearance Corporation ("Clearance Corporation") for alleged violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act").[1] The District Court for the Southern District of New York (Hon. Lee P. Gagliardi, Judge), after a non-jury trial, granted judgment for the plaintiff in the sum of $1,441,-122.45, plus interest, on the ground that Clearance Corporation had aided and abetted T. P. Richardson & Co. ("Richardson"), a California broker-dealer, in committing a Section 10(b), Rule 10b–5 fraud, which caused damage to the plaintiff. *Edwards &*

---

[*] The Honorable Milton Pollack, United States District Judge for the Southern District of New York, sitting by designation.

[1] 15 U.S.C. § 78j(b). Plaintiff also sued for alleged violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, and common law fraud. Jurisdiction was predicated on § 27 of the Exchange Act, § 22 of the Securities Act and pendent jurisdiction.

*Hanly v. Wells Fargo Security Clearance Corp.*, 458 F.Supp. 1110 (1978). For reasons that will appear, we are constrained to reverse the judgment and to order a dismissal of the complaint.

The able District Court made detailed findings of fact and we refer for details to its comprehensive opinion.

*Richardson* :

Richardson was a registered broker-dealer, based in Los Angeles, which specialized as an institutional broker in the so-called "third market," that is, the over-the-counter market in securities which are listed on the major stock exchanges. Richardson matched buy and sell orders of large blocks of listed stocks made by large financial institutions. Richardson, in matching buy and sell orders, was a buyer or seller on its own, for it made its profit on the difference in price agreed to by the institutional buyer and seller. Although Richardson was generally able to match the buy and sell orders exactly, at times it would effect an unmatched trade in order to accommodate one of its institutional clients. In such instances, Richardson would take a position on the shares which were in excess after the matching of orders. To eliminate these excess positions, Richardson used the services of stock brokers like the plaintiff, Edwards & Hanly, who were members of the New York Stock Exchange, to liquidate such positions as it had assumed.

From February 1974 through April 15, 1975, Richardson maintained a special *cash* brokerage account with E&H on a delivery versus payment, receipt versus payment basis. The account both bought and sold listed securities. The orders were regularly telephoned by Richardson's traders to Dominic Gulemi of E&H's Huntington, New York office. The Richardson account was the largest account in appellee's Huntington office, producing as much as $100,000 in commissions annually.

*Wells Fargo Bank* :

In 1973 Richardson had made a financing arrangement with the Wells Fargo Bank, N.A. ("the Bank") in San Francisco under which the Bank would advance the purchase price for Richardson's account to a seller of securities bought by Richardson, and the certificates sold would then be delivered to Richardson's buyer and the purchase price would be collected. In clearing these institutional third market trades for Richardson, the Bank utilized Clearance Corporation, its clearing agent in New York, the defendant-appellant herein, to handle the receipt and delivery of the cash and securities.[2] The Bank collected interest from Richardson from the time it advanced funds for the Richardson account until it collected the purchase price. The funds which it advanced to Richardson and to some 70 other brokers through the Clearance Corporation account in the Morgan Guaranty Bank in New York were "federal funds", *immediately* available to it when deposited. Its clearing agent in New York, appellant herein, nevertheless paid sellers of securities to the broker in *regular* funds, drawn on a bank on the West Coast, which did not clear for several days. This created a "float" or a continual lag which enabled appellant to invest the money in commercial paper and certificates of deposit, collecting interest on such instruments. Under the procedure that was prescribed by the Bank, Richardson would deliver confirmation slips to the Bank in Los Angeles which would then instruct Clearance Corporation in New York. When Richardson sold stock through brokers in New York it would deliver the certificates sold to Clearance Corporation and the buyer would receive the certificates upon payment. When Richardson bought stock it would instruct appellant through the Bank to pay against delivery. Clearance Corporation did not have authority to clear any trades for Richardson without first receiving instructions from the Bank. 458 F.Supp. at 1114.

2. Clearance Corporation was wholly owned by Wells Fargo Company which also owned the Wells Fargo Bank.

*The short selling*:

Early in 1974, without the knowledge of the Bank, Richardson secretly began to deviate from its regular practice of matching buy and sell orders on institutional trades and began to speculate for its own account. Richardson embarked on a program of making massive short sales for its own account of highly volatile "glamour" stocks. By late 1974 this short-selling comprised a substantial part of Richardson's total business.

To cover its short positions Richardson began to borrow stock. The stock lenders received 100% cash payments of the closing price of the stock on the most recent trading day. The stock loan agreements also required adjustments in the cash collateral as the stock went up or down. These adjustments were called "mark-to-the-market" payments.

In order to generate enough cash to make the "mark-to-the-market" adjustment, Richardson adopted a procedure of falsification. First it falsified its records by creating false order tickets showing that it had purchased stock on a matched order trade between institutions when, in fact, it had borrowed the stock. Richardson then attached these false orders to its instructions to the Bank and, thus, was able to obtain advances from the Bank pursuant to its credit line. By December 31, 1974 Richardson had borrowed in excess of $25 million worth of stock from fourteen different institutions. All this borrowed stock was used for delivery on short sales that had *previously* been made by Richardson.

As a result of a rising market, Richardson was unable to meet the "mark-to-the-market" payments during March and April, 1975. On April 15, 1975, Richardson advised the SEC of its insolvency. By then its stock loans were undercollaterized by almost $3 million, and over $20 million worth of short sales, principally to broker-dealers like the plaintiff, were not covered by stock.

Upon notice of Richardson's insolvency, these broker-dealers were required to buy-in on the open market. The cash loss to the brokers—the difference between the price at which Richardson sold the stock short and the buy-in price to the brokers—was about $3.4 million. Of that total, appellee sustained a loss of about $1.4 million.

Beginning as early as February 1975, Richardson's biggest brokers, E.F. Hutton, B.C. Christopher, and North American Equity (as well as Kaufman & Co.) informed Richardson that they were buying in their accounts with Richardson and would no longer do any business with it "because of its consistently late deliveries of stock that it had sold to them." 458 F.Supp. at 1117. Richardson thereupon decided to increase the volume of its short sales through E&H "because, by contrast, that firm had never pressed Richardson as hard to make timely delivery." *Id.*[3]

From about March 3, 1975 to April 7, 1975, Richardson in its cash account with E&H sold 23,000 shares of Digital Equipment Corporation, 9,500 shares of E.I. duPont, 2,600 shares of Fairchild Camera Co., 17,500 shares of Halliburton Corp., and 16,500 shares of Texas Instruments. Virtually all of these were, in fact, short sales. *Id.*

Though the standard sales contract between brokers in the industry required delivery within five business days in a "delivery against payment" and "receipt against payment" account, E&H through March 1975 tolerated delays in delivery by Richardson of two to three months in some extreme cases, and delays of two or three weeks as a regular practice. No rule or practice precluded E&H from buying in an account once the due date for delivery had passed, but E&H had an obvious disincentive to buy in this particular account because it generated substantial brokerage commissions. 458 F.Supp. at 1118. When Richardson finally went under on April 15, 1975, E&H was then compelled to buy in about thirty failed trades, almost two-thirds of which were at least three weeks past

---

3. Cf. *Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166, 1173 (8th Cir. 1972).

due. Almost 90% of the short sales which plaintiff had to buy in were made by Richardson in March after its other large brokers had closed their accounts with Richardson. *Id.*

Dominic Gulemi was the registered representative at E&H in charge of the Richardson account. He maintained a close personal relationship with many Richardson employees. In 1974, he took three trips to California, including one during which he and the Richardsons planned a joint venture—the establishment of a restaurant business in Los Angeles. 458 F.Supp. at 1118 n. 3.

The course of particularly late deliveries on stocks sold to or through E&H by Richardson on the six stocks on which appellee claimed damages was as follows:

(1) *Halliburton*—1,000 shares due November 20, 1974 (4 months); 6,000 shares due December 17, 1974, not delivered until January 17, 1975 (4 weeks); 1,500 due March 7—delivered 500 March 17 and 1,000 March 26 (split delivery); 1,500 shares due March 19—not delivered by April 15; 1,200 shares due March 24, not delivered by April 15. At the time of the insolvency notice of April 15, Richardson had failed to deliver 17,500 shares of Halliburton.

(2) *Texas Instruments*—None of the 18,000 shares sold was delivered, though 5,000 shares were due as early as March 10 (5 weeks); and one sale of 1,500 shares was due January 7 (3 months).

(3) *Digital Equipment*—By April 15 delivery on 23,000 shares was late. Of that amount 7,000 shares were already four weeks late and 7,500 shares were already three weeks late.

(4) *Fairchild Camera*—2,600 shares were never delivered though the delivery date was March 10 (more than a month).

(5) *DuPont*—There was a late delivery on February 7, 1975, of 1,100 shares due on November 18, 1974 (eleven weeks). Richardson sold short 9,500 shares in March which were never delivered, the delivery of some of which was already over a month late.

(6) *Schlumberger*—Showed late deliveries of more than a month with a split delivery in between.

E&H did nothing about these late deliveries except to inquire when the stock would be delivered. It did not buy-in until after April 15, though, as we have seen, other brokers did much earlier.

*Joseph C. Werba:*

We now turn to the circumstances upon which the District Court found Clearance Corporation liable. Joseph C. Werba, president of Clearance Corporation since April 1974, was friendly with a number of Richardson's employees and would see them socially on his frequent business trips to Los Angeles. Richardson had given Werba and his family generous gifts, including airline tickets to Los Angeles and a vacation weekend on Cape Cod. Beginning in November 1974, Werba made "interest free" loans to Richardson from Clearance Corporation's bank account, previously described as the means for creating the "float" for the earning of interest. Richardson, in turn, used the advances in attempts to meet its "mark-to-the-market" payments.

Werba had no authority to make these loans without interest, and he failed to inform the Bank or his superiors at Clearance Corporation that he was doing so. The five separate advances totalled over $1 million. The advances were repaid except for the final advance of $500,000 which was made on March 31, 1975, and on which Clearance Corporation lost $309,000 when Richardson became insolvent.

In early December 1974, after the first unauthorized advance, Werba met two Richardson employees for dinner, one of whom was Michael Wawra, its cashier. Wawra explained that Richardson had begun to suffer losses on certain trades and that it did not want the Bank to know for fear that the Bank would terminate its draft line of credit. The Richardson employees persuaded Werba to aid them in concealing the trades from the Bank by handling them on a "special" basis. They proposed that on these trades Richardson

should not follow the usual required procedure of routing written instructions through the Bank, but instead Richardson would telephone instructions directly to Clearance Corporation in New York, leaving the Bank without knowledge of the trades.

The District Court found that at a second meeting in Los Angeles Werba was informed of Richardson's short positions and of its desire to hide them *from the Bank*. At dinner with Thomas Richardson, Werba received $2,000 in cash for "helping" Richardson out. 458 F.Supp. at 1117.

From January through March 1975 Clearance Corporation cleared approximately 52 "special" trades for Richardson in breach of the authorized procedure required by the Bank and without its knowledge.

Marianna Ianuzzi was in charge of receiving and delivering securities in the Clearance Corporation office in New York. Werba told her of the "special" trades for Richardson and how to handle them. He did not tell her that these trades were in fact short sales. 458 F.Supp. at 1117. She received her instructions on the "special" trades, thereafter, directly from Richardson and sent handwritten confirmation statements directly to Richardson when the trades were completed.[4]

The unauthorized advances by Werba to Richardson were not discovered by his superiors in Clearance Corporation because the daily money sheets were sent to the Bank, but not to the Bank officials in San Francisco who were directors of Clearance Corporation and who were charged with its supervision. Morgan Guaranty in New York, where Clearance Corporation had its bank account, did send monthly statements of the account to these directors. These statements did not identify *individual* deposits and withdrawals, but showed the amount of the available "float."

■ The District Court determined that the defendant Clearance Corporation was liable for the losses of appellant E&H on a theory of vicarious secondary liability. It held that the employee, Werba, was guilty of aiding and abetting Richardson in violating Rule 10b–5 because he "substantially assisted" Richardson in perpetrating the fraud.[5] The District Court then held the defendant corporation liable vicariously as an aider and abettor for the acts of its agent, Werba, on the theory of *respondeat superior* and, alternatively, as a "controlling person" under § 20(a) of the 1934 Act because it had inadequately supervised Werba.

## I

Werba, the officer of the appellant who did the alleged aiding and abetting, is not a defendant. Yet, in order to assess the culpability, if any, of Clearance Corporation, we must analyze the actions of Werba, the unfaithful employee.

■ The determination by the District Court that Werba was not a principal in Richardson's fraud against E&H is sound, for as Judge Gagliardi noted "the allegedly fraudulent sales were between Richardson and the plaintiffs." As we have noted, he held that if Clearance Corporation is liable at all, it must be under a theory of secondary liability—based on Werba's role as an aider and abettor. 458 F.Supp. at 1121.

---

4. A key issue in the trial below was the extent of Ianuzzi's knowledge of the Richardson short selling scheme since she was frequently contacted by E&H employees for information on the late deliveries in the days immediately preceding Richardson's collapse. The District Court found that Ianuzzi remained innocent of the Richardson scheme, and that "until Richardson's demise . . . Ianuzzi remained as much a target of its [Richardson's] fraudulent assurances as Gulemi." 458 F.Supp. at 1123.

5. The District Court applied the three-prong test for aider-abettor liability adopted in *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47–48 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), and *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). This test requires proof of (1) fraud by the primary violator (Richardson); (2) knowledge of the primary fraud by the alleged aider-abettor; and (3) substantial assistance. *See also* Restatement (Second) of Torts § 876.

■ We conclude that Werba's activities in lending Richardson money, free of interest, and in hiding the special trades *from the Bank* did not substantially assist the violation of 10b–5 by Richardson, which was not the short selling but the failure by Richardson to tell E&H that it was selling short. Nor were such activities the proximate cause of E&H's loss. *See Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 95 (5th Cir. 1975): "A remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud."

■ Werba was held to be an aider-abettor on a "but for" theory of causation. The District Court reasoned that "but for" Werba's acquiescence in the "special trade" arrangement and advancement of interest-free funds, Richardson would not have been able to finance or to conceal its massive short sale speculation. We question whether these acts "caused" the loss of E&H in a proximate sense, since that loss was "caused" not by Richardson's short selling but by the failure of Richardson to inform E&H that it was short selling for its own account. In *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 163–64 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), the Third Circuit construed the "substantial assistance" requirement of aiding and abetting as a causation concept. A "but for" analysis was rejected as insufficient. We agree.

Whether Werba's activities gave such substantial assistance to Richardson as to make him a culpable aider-abettor, even though not a principal, is a question of law. The answer depends not only on whether Werba knew of the fraud, the failure by Richardson to tell E&H that it was short selling, but also on whether Werba had a duty to speak. There is no claim that Werba made any false representation to E&H that Richardson was not selling short. It is his silence in the face of alleged "knowledge" that Richardson was short selling that it is claimed would make him an aider-abettor.[6]

The trial court recognized that a transfer agent, and similarly a clearing agent, is generally under no fiduciary duty to the owners of the securities that pass through its hands. *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 97 & n. 29; *see Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151–52, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). It decided, nevertheless, to evaluate *scienter* under a "recklessness standard," applying that standard to Werba.

■ We have not used the "recklessness" standard when money damages are claimed in an aiding and abetting context, except on the basis of a breach of fiduciary duty. In *Rolf v. Blyth, Eastman Dillon & Co., supra* n.5, 570 F.2d 38, we held that "recklessness" may be an appropriate standard for *scienter* when there is a fiduciary duty, but we have gone no further. To the extent that Werba is held culpable because he "recklessly" *failed to discover* whether Richardson was telling its brokers that it was short selling, he did not achieve the status of an aider-abettor. "The *scienter* requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing." *Woodward v. Metro Bank of Dallas, supra,* 522 F.2d at 95.

**6.** Clearance Corporation's directors first learned of the special trades and loans, but not of Richardson's short selling on April 1 or 2, 1975 when Gary Bruno a vice-president of Clearance Corporation, independently decided to inform the Bank of the unauthorized dealings with Richardson. At that time Werba was on vacation in the Virgin Islands. He was summoned to San Francisco for an explanation immediately upon his return on April 7. Werba met with his superiors in San Francisco on April 8 and went from there to meet with the Richardson people in Los Angeles on April 9.

Werba returned to New York on April 12 but was suspended from further duties at the office. There is no evidence that Werba ever told anyone at the Bank that Richardson was selling short, nor did Bruno have any knowledge of the short selling scheme. Whatever knowledge there was of Richardson's fraud, that knowledge remained with Werba until Richardson's collapse. Accordingly, we need not look beyond Werba himself in determining whether there was a duty to disclose Richardson's scheme to E&H.

By way of illustration, if a bank lends money to a customer who then uses it to perpetrate a fraudulent scheme, there is probably neither intent nor causation on which to find the bank liable for a 10b–5 violation.[7] On the other hand, for example, if the bank encourages a borrower to sell notes to others without disclosing that they are subordinate to the bank's own loan, it may become an aider-abettor. *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978).

■ Finding a person liable for aiding and abetting a violation of 10b–5, as distinct from committing the violation as a principal, requires something closer to an actual intent to aid in a fraud, at least in the absence of some special relationship with the plaintiff that is fiduciary in nature. Our difficulty is that the judge concluded that "Werba knew that Richardson was defrauding broker-dealers by failing to disclose its short position *or, at least, recklessly failed to discover Richardson's fraud.*" 458 F.Supp. at 1123. (Emphasis added.)

This falls short of a finding of fact that Werba actually knew that Richardson was not disclosing its short position. Because we do not know which standard the District Judge thought predominant, we would ordinarily remand for the Judge to make an explicit finding. Since the record discloses, however, that the proximate cause of appellee's loss was its own failure to exercise due diligence, we can dispose of the appeal without considering whether, in these circumstances, vicarious liability was properly imposed upon the Clearance Corporation for the acts of its president. In that posture of the case, the standard by which Werba is judged is not controlling and the alleged inadequacy of supervision of its president by appellant is not material.

■ Moreover, we do not agree with the legal conclusion of the District Court that

appellant could be made liable to the plaintiff broker by inadequate supervision of Werba. There was no reasonably foreseeable consequence of harm to appellee by the gaps in the supervision of Werba.

The failure to tighten the supervision of Werba could harm only the Bank itself. It was lending money on the interim collateral of stock certificates that passed through Clearance Corporation simply as a collection mechanism to protect its own interest. It was not within its function to alert brokers on whether their own transactions were long or short, cash or margin, to be handled in individual or omnibus accounts. The transactions were between the brokers themselves. No one should have known better what the transactions were than those who made them.

## II

■ The District Court, in the context of an affirmative defense, held that E&H was not negligent.[8] We approach the issue of E&H's conduct from the standpoint of causation and due diligence. In any event, negligence is a mixed question of fact and law, and we are not necessarily bound by the limitations of Rule 52(a). *Mamiye Bros. v. Barber S.S. Lines, Inc.,* 360 F.2d 774, 776–78 (2d Cir.), *cert. denied,* 385 U.S. 835 (1966); *see Karavos Compania Naviera v. Atlantica Export Corp.,* 588 F.2d 1, 7–9 (2d Cir. 1978). This is even clearer when the decision on negligence is supported by a misconstruction of a relevant regulation, such as Regulation T.

■ We have studied the record carefully and we have come to the conclusion that E&H failed to exercise due diligence as a matter of law: (1) by not discovering that the massive selling by Richardson was for its own account and (2) that the late deliveries indicated short selling by Richardson. The record compels the further conclusions: (3) that the frequent lateness in delivery

---

7. *See* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597, 630–31 (1972).

8. This was appellant's 21st affirmative defense.

should have put it on notice that something was seriously amiss; (4) that the cashier's department failed to press the salesman on the Richardson account to get information about late deliveries from Richardson; (5) that the responsible people at E&H for a long time did not know how much credit was outstanding to Richardson; (6) that the firm failed to press Richardson directly for credible answers on why deliveries were so late on huge sales of volatile "glamour" stocks; and (7) that it violated Regulation T, 12 C.F.R. § 220.4, and possibly also 17 C.F.R. §§ 240.10a–1(d), 240.10a–2(a) (or earlier equivalents), by failing to inquire, in view of Richardson's pattern of late deliveries, whether the sales it marked "long" were actually long sales and by failing to buy in at a reasonable time.

In sum, we have concluded that E&H, having caused its own loss, is now seeking to put the blame on the clearing agent.[9] As we said in *Hirsch v. du Pont,* 553 F.2d 750, 763 (2d Cir. 1977): "The securities laws were not enacted to protect sophisticated businessmen from their own errors of judgment."

▇ The primary cause of E&H's loss was its failure to comply with Regulation T, 12 C.F.R. § 220.4, pursuant to § 7 of Exchange Act, 15 U.S.C. § 78g. We cannot condone the failure of E&H to press Richardson on late deliveries in such large amounts. Regulation T provides that a purchase or sale may not be made by a broker firm or customer in a special cash account, unless "the security is held in the account or the creditor is informed that the customer or his principal owns the security and the purchase or sale is in reliance upon an agreement accepted by the creditor in good faith that the security is to be promptly deposited in the account." 12 C.F.R. § 220.4(c)(1)(ii). Richardson's status as a registered broker-dealer did not prevent it from also being a customer for purposes of

Regulation T. *See* 12 C.F.R. § 220.101(b); 2 L. Loss, Securities Regulation 1250 n. 35 (2d ed. 1961).

▇ There is no evidence that E&H ever agreed with Richardson that the securities would be delivered at a stipulated date beyond the five-day period for delivery. Even if E&H at first thought that Richardson's sales were long, it was on notice of its obligation to cover the open position on late delivery, unless it knew or had been informed by the seller either (1) that the securities were in transit, or (2) that the seller *owned* the securities, that it was then impractical to deliver them, and that the securities would be delivered as soon as possible without undue inconvenience or expense. If the broker did not have such knowledge, it had no right to borrow stock to deliver to its own customer, but was under a duty to cover the transaction by buying in for "cash," for the account of the customer, the securities sold. 2 L. Loss, *supra,* at 1233.

In addition to its careless attitude in marking the Richardson sales "long" (which alone might not be a breach of duty, *see Naftalin & Co. v. Merrill Lynch, supra,* 469 F.2d at 1175), the moving cause of its loss was its own negligence in the face of repeated failure to deliver stock due from Richardson, in continuing to do business on that basis, and in failing to press for specific answers to explain the lateness of particular deliveries. Its sporadic inquiries of the clearing agent were not legally sufficient in the circumstances, considering the size of the "fails," the history of the dealings with Richardson, and the omission to observe the requirements of even a relaxed interpretation of Regulation T and of the Commission's rules. Moreover, if there was an intervening efficient cause for its loss, it was its reliance on the responses of Richardson itself to sporadic inquiries. These

---

**9.** As Judge Murrah observed in *Naftalin & Co. v. Merrill Lynch, supra,* 469 F.2d at 1181: "We have no doubt that under Section 7 and Regulation T as presently structured, a broker/dealer who has entered into a special cash account transaction in good faith, but who has not acted diligently to sustain his good faith belief that prompt delivery will be made, cannot excuse his negligence by placing all the blame upon a customer that has deceived him" (footnote omitted). Here, of course the "customer" (Richardson) is not a defendant.

responses were evasive, and E&H had no right to rely on them unless they afforded a "credible" reason for the delay in delivery of the securities. *See Naftalin & Co. v. Merrill Lynch, supra,* 469 F.2d at 1177 & n. 14. Since the transactions were effected directly between broker-dealer (E&H) and broker-dealer (Richardson), it is quite inexplicable that credible explanations for late delivery should not have been demanded of Richardson itself. This failure to press Richardson for the specific reasons for the particular delays and whether the purported long sales were not, in fact, short sales, can only be attributed to E&H's desire for commissions and its willingness to extend credit, if necessary, in the cash account.

If E&H believed that Richardson was the seller for its own account it failed to fulfill its obligations as we have noted. If the sale was by a broker, like Richardson, for an account in which Richardson had no interest it was the duty of E&H to inquire whether that was so. The record establishes that E&H failed to inquire initially, or even after failure to deliver promptly, whether the particular sale was "long" and, indeed, whether it was of stock owned by Richardson or by a customer of Richardson. Gulemi conceded that he never asked whether Richardson's sales were short or long, though some of Richardson's excess sales from third market operations legitimately would be short sales if it wanted to dispose of its own position before excess stock was delivered to it. But in such case, the broker could not mark the sale as "long" and the requirements for short selling would apply.

E&H produced no expert evidence to support the contention that the deliveries were not inordinately late. The objective evidence speaks for itself. Foote, the cashier of E&H, conceded as being "extraordinarily late" a 1,000 share fail in Halliburton, a du Pont trade on November 11, with delivery delayed until February 7, two Schlumberger trades extending over a three month period and a Texas Instruments trade, executed December 30, due January 7, 1975 and never delivered.

The only excuse given for the failure of E&H to press Richardson harder, which came from Foote, was that the cashier's department was not permitted to call a customer; this had to be done through the salesman on the account. Whether there was a lack of liaison between cashier and salesman, or whether Gulemi, friendly to his customer, Richardson, suppressed inquiry, is not clear.

What is clear is either that the internal controls of E&H until the last week of March failed to point up the credit balances that had been accumulating in Richardson's account because of its failure to deliver stock or that the information was disregarded. In the last week of March, when E&H transferred the clearing functions for its retail accounts to another firm it retained for itself the clearing function for institutional clients like E&H. After the transfer effective March 27 it appeared quite clearly that Richardson's failure to deliver accounted for a large percentage of E&H's outstanding institutional credit balances. The Richardson balance "stuck out like a sore thumb." 458 F.Supp. at 1119 & n. 5.

Before the partial transfer of the clearing function to another firm, Bert G. Edwards, the managing partner of E&H, noticed in the middle of March that there was a large credit balance in one account and, upon inquiry, learned that this was Richardson's account. Edwards testified that he thereupon "established that we wanted to get the stocks in, that there were too many stocks out for one account, and we wanted to get them in as soon as possible. We had the assurance of everyone working in the case that they would get right to work on it, and put the pressure on and we would start to get the stock."

A delivery of one stock came in shortly thereafter and E&H had to make a policy decision. Checking the market price on that day "there appeared to be little or no risk." Edwards testified: "If we had to buy them in there would have been a profit and the profit of course would have gone to Richardson. But we would have lost the

account, and probably the registered representative as well."

At this point Edwards consciously assumed a market risk for E&H. Clearance Corporation did not encourage him to accept further orders from Richardson nor did it participate in the negotiation of such sales.

When asked whether he put any pressure on Richardson or tried to reach it directly, Edwards replied that he put pressure on his own employees, and sat by once while his employee, Jim Barbi, put in a phone call to Richardson "and he was not successful in talking to someone."

On April 7, an E&H margin clerk calculated that Richardson owed the plaintiff over $7 million in stock and informed Gulemi. Gulemi called Wawra, the Richardson cashier, "who falsely attributed the delay to the failure of Richardson's clients to deliver it stock and promised delivery within a week." 458 F.Supp. at 1119. O'Hare, the Huntington branch manager, subsequently spoke to Wawra and found him to be evasive. It must have been obvious that since several different stocks were involved there could hardly be a single legitimate cause for a common failure to deliver, nor would it be likely that there was a common single basis for an assurance of simultaneous delivery by the end of the week. The natural inference was that Richardson was short and did not have the stock to deliver.

On April 7, the market had moved upward and continued to move upward. When asked what he did about the Richardson account that week, Edwards replied: "I didn't do a great deal except to stay on top of it." Finally, Edwards testified that three business days before the Richardson

failure, he brought a lot of pressure to bear. This "pressure," it turned out, was that "I just talked to the people who would bring the pressure." This apparently included the frustrated call to the Richardson cashier who could not be "reached."

Still, instead of "buying in" the late shares, Edwards was planning to give Richardson a "margin call" requiring Richardson to put up $300,000 to $400,000 to cover the failed trades. He testified that he knew that Richardson was an "in-between" house which would "try to bring a buyer and seller together and if there is a residue they absorb it or sell it for themselves"; hence, as a house short of capital, Edwards thought that Richardson would prefer to deliver the stock rather than meet the margin call. He said he held this quixotic belief in spite of his admission that he knew the credit balance was six or seven million dollars and that the risk to E&H had increased.

Edwards never inquired about the pattern of deliveries in the Richardson account in any attempt to evaluate the nature of the account or the risk. As early as February 1975, Gulemi told Wawra at Richardson that "people are getting nervous."[10] In spite of the February nervousness, no action was taken. At the same time, four other brokers, as noted above, stopped doing business with Richardson and proceeded to "buy in" for Richardson's account because of late deliveries.[11]

When, in the face of late delivery, E&H borrowed stock to deliver, it was acting contrary to the requirement of Regulation T, as well as 17 C.F.R. § 240.10a–2(a), since it did not know that Richardson actually owned the stock it had sold.[12]

10. The nervousness can only be attributed to a fear that Richardson might not get the stock in, *i. e.*, that it had no control over the stock it had sold.

11. Foote, the head cashier of E&H, conceded that from April 6 on "[i]t probably should have, but it didn't" cross his mind that these were short sales because "I wasn't getting an answer or delivery of securities for a clearing in this account."

And Gulemi was concerned enough to tell his manager, O'Hare, that one of the principals should call and speak to Richardson "direct." During that week of April 7 to April 15 Gulemi spent his time "[h]oping and praying stock would come in." He and O'Hare also called Richardson daily.

12. E&H was not induced or aided by Clearance Corporation to handle the transactions in this way. It is significant, moreover, that Clearance Corporation is not charged with lending

In any event, it was with Richardson, not the Clearance Corporation, that E&H transacted the purchases and sales. If there was late delivery, E&H had direct contact with Richardson by telephone and could ask it directly why there was delay in delivery.[13] The timing of stock delivery was entirely in the hands of Richardson, the seller, and not in the hands of the clearing agent. When E&H chose to ask the clearing agent instead it was like asking a bank when a depositor would deposit a check or like asking a librarian when a borrower would return a book.

Indeed, Ianuzzi, to whom the inquiries were directed at the clearing agent, was found by the trial court to have known nothing about the short-selling by Richardson. Reliance on the clearing agent was not justified when the line was open directly to Richardson, the seller. Richardson would certainly have been in a better position to know when delivery could be expected by E&H, and Clearance Corporation would reasonably expect the brokers to call Richardson for precise information.

It is also of significance that E&H actually heard a timely rumor that Richardson was "short" and in trouble, and put it aside. The only check made on the rumor was, apparently, a casual inquiry of Ianuzzi whether she, too, had heard the rumor. There was no pressure on Richardson for an explanation, even in the face of the unusual circumstance that some shares had failed to be delivered a second time while the first fail in the *same* stock had not yet been remedied.

The only fair inference from the record is that the appellee had every reason to believe that things were amiss at Richardson and that its indulgence of that firm was at its own risk for its own business reasons. When it borrowed stock to deliver to its own customers to make up for the lateness of Richardson, and permitted that lateness to become extraordinary, it was carrying its indulgence to a dangerous extreme, for that conduct affected its capital ratio. The protection of investors, which is the prime purpose of the securities laws, requires more vigilance than that. Broker-dealers have too much responsibility to the public to allow slipshod methods to serve as an excuse.[14] The third party should not be cast in liability for this plaintiff's own failures.

Appellant resorted to no subterfuge to keep E&H from asking Richardson directly to tell them what was going on. *Cf. Hirsch v. du Pont, supra,* 553 F.2d at 762–63. The unsatisfactory state of affairs was the result of E&H's failure to exercise due diligence in demanding straight answers from Richardson or doing something about it. This failure to act was the effective cause of its loss. Its ingredients are historical:

> The common law affords to everyone reasonable protection against fraud in dealing, but it does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information.

2 Kent, *Commentaries* 485.[15]

The judgment is reversed with direction to dismiss the complaint.

---

stock to Richardson to make it appear as if Richardson owned the stock.

**13.** Indeed, there was a special open wire between the Richardson office in California and the E&H office in Huntington.

**14.** "[T]he sale of a security which has not been delivered by the customer is just as much an extension of credit as the purchase of a security for which the customer has not made payment. . . . Liquidation of such an illegal extension of credit by buying-in the undelivered stock is an absolute necessity if the integrity of the regulation ["T"] is to be preserved and its policy effectuated. It is, thus, manifest that the duty to liquidate such a transaction is clearly implied in the absence of a provision specifically directing it." *Naftalin & Co. v. Merrill Lynch, supra,* 469 F.2d at 1176 (citation omitted).

**15.** Cited in Haimoff, *Holmes Looks at Hochfelder and 10b–5,* 32 Bus.Lawyer 147, 164 (1976).