NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH,
PA., Plaintiff,

v.

Robert E. EATON, Jr. and Margaret A.
Eaton, Defendants.

No. 88 Civ. 3554 (LLS).

United States District Court,
S.D. New York.

Dec. 14, 1988.

Lloyd J. Herman, Richard F. Russell, D'Amato & Lynch, New York City, for plaintiff.

Robert E. Eaton, Jr., Mills, Mass., pro se and for defendants.

## OPINION AND ORDER

STANTON, District Judge.

National Union Fire Insurance Company of Pittsburgh ("National Union"), an issuer of financial guarantee bonds, sues to enforce indemnity agreements between itself and limited partners in tax shelter limited partnerships, and to enforce its rights as subrogee on the limited partners' promissory notes which it honored on their behalf. National Union issued bonds which guaranteed, to the partnerships and to the bank that financed the partnerships, that the limited partners would make all of the capital contributions represented by their promissory notes to the partnerships. The defendant limited partners, Robert E. Eaton, Jr. and his wife, Margaret A. Eaton ("the Eatons"), stopped making their required contributions, and National Union made them on their behalf. Now it sues the Eatons for reimbursement, under the indemnity agreements they gave National Union at the time it guaranteed their payments, and as subrogee on the notes on which the Eatons defaulted.

The Eatons counterclaim, alleging that National Union aided and abetted the limited partnership's federal securities law vio-

lations,[1] violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1982 and Supp. IV 1986), and was negligent in its role as a surety. National Union moves for summary judgment dismissing the Eatons' counterclaim.

For the reasons stated below, National Union's motion is granted.

## Background

In 1982 and 1983 the Eatons received private placement memoranda ("the PPMs") for three limited partnerships: Promenade Plaza Limited Partnership, Barrick Ralston Limited Partnership, and Barrick North Belt Limited Partnership (collectively "the partnerships"). The partnerships were organized, and the PPMS were prepared, by The Barrick Group, Inc. (the "Barrick Group"), an entity controlled by Leslie Barth. The Barrick Group was the general partner of the partnerships.

The partnerships' purpose was to raise capital by selling limited partnership interests in order to acquire and then lease office buildings in Texas and Cincinnati. Investors would make a cash down payment, and sign promissory notes (the "notes") for the balance of the purchase price of their limited partnership interests. The anticipated return to the limited partners included income tax deductions as well as payments from leasing space in the buildings.

Since the Barrick Group wished to assign the notes to a bank in return for a loan of working capital, it needed, and asked, National Union to supply the partnerships bonds which guaranteed payment by the limited partners of their notes. National Union, in its turn, required the limited partners to execute indemnity agreements whereby they agreed to reimburse National Union for any payments it made on the notes to the bank on their behalf. In addition, the limited partners pledged their partnership interests as security for their obligations to National Union under the indemnity agreement.

In the fall of 1982 George Marvin–Smith (a principal of the Barrick Group) called upon Mr. Eaton, a vice president and principal of Buttonwood Securities Corporation of Massachusetts, to discuss Mr. Eaton's acting as a broker for the Promenade Plaza partnership. (Aug. 25, 1988 deposition of Robert E. Eaton, Jr., Exhibit A to Affidavit of Lloyd J. Herman, sworn to Sept. 12, 1988, p. 29–30) Based upon his review of the documents Mr. Marvin–Smith gave him, his visit to the property which was the subject of the partnership, the PPM, his bi-weekly meetings with Mr. Marvin–Smith, and other background information, Mr. Eaton and his firm elected to participate in the offering and receive an 8% commission on the interests sold. (*Id.* at 26–27, 30–34) After a similar review, including hiring a certified public accountant to review the PPM, Mr. Eaton and his firm agreed also to sell interests in the Barrick Ralston and Barrick North Belt partnerships. (*Id.* at 34–40)

Further Mr. Eaton, on behalf of himself and his wife, purchased limited partnership interests in, and executed promissory notes and indemnity agreements for, each of the three partnerships. When they failed to make numerous payments on their notes, National Union paid the bank $29,270.78 on their behalf. On May 20, 1988 it commenced this suit for reimbursement.

## Duty

In their counterclaim, the Eatons contend that National Union (1) aided and abetted

---

1. The Eatons' counterclaim does not specifically allege that National Union aided and abetted the Barrick Group's purported violation of the federal securities laws. Rather it states that National Union negligently reviewed and approved certain documents, that these "documents were fraudulent and illegal because they failed to disclose facts ... and numerous other material omissions and untruths," and that "But for the position of the plaintiff as surety on the notes the defendants would not have invested in" these partnerships. (Counterclaim, p. 2) The Eatons' memorandum, however, refers to the provisions of the federal securities laws discussed herein and their requisite elements.

Although defendant Robert Eaton is an attorney, he and Mrs. Eaton are in a sense *pro se* litigants and, in light of the liberality of Fed.R. Civ.P. 15(a), this opinion gives full weight to the allegations in the Eatons' memorandum as well as their counterclaim, and considers their arguments, wherever set forth, as a whole.

the Barrick Group's securities law violations by tolerating and failing to disclose the Barrick Group's misrepresentations in the PPMs (Defendants' Memorandum, p. 13–19); (2) violated RICO by engaging in an enterprise defined as being "the Barrick Group offerings of fraudulent securities in interstate commerce with National Union acting as surety on the investor notes" (*Id.* at 20); and (3) "acted in a reckless manner in underwriting the three partnerships" because the terms of the partnerships did not comply with National Union's underwriting [2] guidelines. (*Id.* at 24)

Underlying these assertions is the concept that because National Union is a major insurance company which investigated the Barrick Group projects before guaranteeing the limited partners' contributions, and the partnerships' promoters told investors that National Union's participation demonstrated the soundness of the partnerships, the Eatons were entitled to rely upon its efforts:

> The type of work that National Union purported to do in their underwriting guidelines was the same that defendant, Robert E. Eaton, Jr., believed a responsible surety would do prior to underwriting a multi-million dollar risk for a premium of 1.6–2% of the equity dollars raised. As a person who knew National Union as a major player in financial insurance the defendants took great stock in National Union's position as surety for the partnership notes. The defendant by his education and experience knew that insurance companies are in the risk business and therefore always aim to minimize risk through sound underwriting.
>
> When George Marvin–Smith, the main liaison of the Barrick Group and National Union, as well as the main contact between the Barrick Group and the defendants, told the defendant that National Union had examined the partnership and approved it for financing; it was not unreasonable for the defendants to assume National Union carefully checked

out the general partner and the deals prior to underwriting them.... The representations he made to the defendants are relevant, material, admissable and should carry great weight.... (Defendants' Memorandum, p. 5–6) (citations omitted).

■ The Eatons' assumption that they were entitled to rely on National Union's status and its actions rests on the mistaken premise that National Union owed them a duty. Unfortunately for defendants, National Union did not undertake to furnish them the solicitude or protection which they may have expected. National Union had an interest in investigating the partnerships to avoid becoming obligated to a stream of future payments if limited partners should default, an event which would most likely occur only if the enterprise failed and the limited partners abandoned it. The research efforts National Union expended were solely for its own purposes; it assumed no obligation to inform others of the investments' merits or infirmities. If defendants drew the conclusion, from National Union's guarantee of their own promises to pay, that the investment would prosper, they did so at their own risk. That conclusion may have seemed reasonable enough, but National Union owed them no duty either to investigate the partnerships or to make disclosures about the investment.

■ The Eatons argue that since they were not bound by their indemnification agreements until National Union issued the bonds, it owed them a duty to issue the bonds with care. (Defendants' Memorandum, p. 11) However, National Union's only duty as the Eatons' surety was to cure their defaults if they failed to make the required installment payments on their notes, not to ascertain for them the wisdom of their making the investments in the first place.

---

**2.** It should be noted, in order to avoid confusion, that National Union uses the term "underwriting" in its insurance sense as guaranteeing the continuation of the limited partners' pay-

ments, not in the usage of the securities law with respect to the distribution of an issue of securities.

### Agency

As support for various aspects of their counterclaim, the Eatons allege that the "relationship of National Union to the Barrick Group ... is one of a powerful principal exercising enormous control over an [sic] subservient agent." (Defendants' Memorandum, p. 6) The Eatons base this characterization upon (1) the Barrick Group's having "collected premiums from the investors, reviewed financial statements of investors and forwarded the investor applications to National Union for approval" (Counterclaim, p. 4); (2) National Union documents ("How to Underwrite a Deal" and "Underwriting the Offering Memorandum Operating Real Estate–Garden Apartments"),[3] which they contend show that "National Union dictated the terms of the Barrick Group's real estate schemes" (Defendant's Memorandum, p. 8); and (3) the representation to them by Mr. Marvin–Smith that National Union "had examined the partnership and approved it for financing." (*Id.* at 5)

It is basic to an agency relationship that the agent acts subject to the principal's direction and control. *In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984); *accord Kyung Sup Ahn v. Rooney Pace, Inc.*, 624 F.Supp. 368, 370 (S.D.N.Y.1985) (element of subservience is essential; no agency relationship where alleged principal lacks right to control alleged agent). Even if the Barrick Group and Mr. Marvin–Smith had National Union's apparent authority to obtain financial information on National Union's behalf from the limited partners, "there is no basis for supposing that they were agents of National Union in marketing or making any representations about the limited partnership interests or for holding National Union responsible to defendants for their actions in that connection." *National Union Fire Ins. Co. of Pittsburgh v. Turtur*, [1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,765, at 98,590 (S.D.N.Y. May 6, 1988), [available on WESTLAW, 1988 WL 48695] *rearg. denied*, [Current] Fed.Sec.L. Rep. (CCH) ¶ 93,979 (S.D.N.Y. Aug. 10, 1988) [available on WESTLAW, 1988 WL 87297]; *Schlifke v. Seafirst Corp.*, [1987] Fed.Sec.L.Rep. (CCH) ¶ 93,107, at 95,443 (N.D.Ill.1987) [available on WESTLAW, 1987 WL 4718] (the investors adduced no facts to show that the bank knew of the alleged misrepresentations made to them by the venture's salesmen in soliciting their investments).

As for the Eatons' contention that National Union dictated the partnerships' terms, National Union does not dispute that prior to accepting its obligations as a surety, it evaluated the financial risks associated with the partnerships. Since it was guaranteeing that the limited partners would make all of the installment payments on their notes, National Union had a business interest in assessing the possibility of their default. National Union, therefore, requested and received the PPMs from the Barrick Group. It did not review the PPMs on the limited partners' behalf, but on its own.[4]

Defendants have entirely failed to establish that National Union was a principal and the Barrick Group an agent, or vice versa, in the transaction as a whole. To the extent that Barrick Group personnel obtained the investors' signatures to National Union's agreement forms, and collected premiums for forwarding to National Union, these actions on National Union's behalf in no way altered the essential nature of the parties' relationships and roles in the transactions.[5]

---

**3.** National Union maintains that these documents—which defendants refer to as National Union's underwriting guidelines—were simply prepared for internal discussion purposes and were never "sanctioned for use as a checklist by underwriters in evaluating the business or financial aspects of a partnership's venture." (Reply Affidavit of Irving V. Goldstein, sworn to Oct. 28, 1988, ¶ 2, 5).

**4.** None of the twenty-five exhibits the Eatons submit as an annex to their memorandum proves that after National Union reviewed the PPMs, the Barrick Group made changes to these documents.

**5.** If Barrick Group personnel acted as unlicensed insurance agents, as defendants claim (Counterclaim, p. 4), that is a matter for the regulatory authorities of the states involved.

### Aiding and Abetting

The Eatons allege that National Union aided and abetted the Barrick Group's violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1983).[6]

▪ To establish aiding and abetting liability under the federal securities laws, defendants must prove three elements: a securities law violation by the primary party (the "primary violation"), scienter on the part of the aider and abettor, and "substantial assistance" by the aider and abettor in the primary violation. *IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980); *accord Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 280, *aff'd on rehearing*, 602 F.Supp. 837 (S.D.N.Y.1985).

The primary violation consists of a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, reliance upon the misrepresentation or omission to one's detriment, and scienter in making the misrepresentation or omission. *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 502 (S.D.N.Y.1987).

▪ Case law adjusts the required degree of the aider's scienter and assistance to the primary violation according to whether the aider owed a duty of disclosure to the defrauded party. If the aider owes the fraud victim such a duty of disclosure, recklessness suffices to establish scienter. *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.1978) (recklessness is highly unreasonable conduct representing " 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the [aider] or so obvious that [the aider] must have been aware of it.' ") (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)), *cert. denied sub nom. Blyth, Eastman Dillon & Co. v. Rolf*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *accord Hudson v. Capital Management International, Inc.*, 565 F.Supp. 615, 624 (N.D.Cal.1983) ("recklessness will suffice for secondary liability where defendant is under a special duty to disclose based on insider status or a fiduciary or similar relationship"). But if the aider does not owe such a duty, the aider is not liable unless it had actual knowledge of the fraud and an intent to aid and abet the wrongful act. *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3rd Cir.) ("knowledge of the underlying violation is a critical element"; "mere unknowing participation in another's violation is an improper predicate to liability"), *cert. denied sub nom. First Pennsylvania Bank, N.A. v. Monsen*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir.1975) (when no "duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.") (citation omitted). In addition, if the alleged aider engaged only in transactions routine to its business, it is less likely to have acted with the requisite scienter. *Id.* at 97 (if "the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities laws. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability") (citation omitted). *Accord Securities and Exchange Commission v. Washington Co. Utility District*, 676 F.2d

---

6. The Eatons state that there is also a "possible liability of plaintiff as a seller under SEC Reg. 12 b–2." (Defendants' Memorandum, p. 15) Construing Mr. Eaton's citation to be to section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2), National Union's liability under that provision is covered by this discussion. In this circuit, those who actively participate in the transaction, aid and abet, or conspire with the seller, may be liable under section 12(2), *Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 276 (S.D.N.Y.1985), and such liability requires the same showing of scienter and substantial assistance as do section 10(b) and Rule 10b–5. *Klein v. Computer Devices, Inc.*, 602 F.Supp. 837, 841 & n. 8 (S.D.N.Y.1985).

218, 226 (6th Cir.1982); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 503–04 (reasonable to infer knowledge and intent from allegations of "participation in atypical financing transactions and the sale, at a discount, of promissory notes among defendants").

More significant here is that where the aider's alleged substantial assistance consists of a failure to act, courts are hesitant to hold it liable absent a duty to act. *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) ("if the aider and abettor owes the plaintiff an independent duty to act or to disclose information, inaction can be a proper basis for liability under the substantial assistance test"), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). *See also Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983) (inaction "ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or was in conscious and reckless violation of a duty to act.") (citation omitted); *IIT v. Cornfeld*, 619 F.2d at 927 ("Apart from a case [where inaction advances the fraud and the aider had a strong motive not to act because the fraud was benefitting him] inaction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act"; accountant "had no independent duty to see to the correction of portions of the prospectus other than the financial statement it prepared"); *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. 175, 179 (N.D.Ill.1986) ("nondisclosure does not provide the 'substantial assistance' requisite to Rule 10b–5 aiding and abetting liability without some special duty"); *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d at 800 ("mere knowledge of a [securities law] violation alone, without assistance or a duty to disclose the violation, is not an actionable wrong"); *Securities and Exchange Commission v. National Student Marketing Corp.*, 457 F.Supp. 682, 713 (D.D.C.1978).

The Eatons contend that the PPMs were "fraudulent and illegal" because, among other things,

they failed to disclose facts concerning the investments, the tax situation of one, Leslie Barth, the sole owner of the various general partnerships controlling the investments, illegal dealings of Leslie Barth, the conflicts of interest of the plaintiff and the limited partners including the defendants, [and] the conflicts of interest between the plaintiff and Leslie Barth (Counterclaim, p. 2)

as well as "[i]mportant documents [which] were prepared by and in one case prepared at the instruction of National Union" such as Remarketing Agreements between the Barrick Group and National Union, the Surety Bond form, legal opinions given to National Union, and the General Partner Indemnification Agreement. (Defendants' Memorandum, p. 15–16).

Even assuming a primary violation, National Union is not liable as an aider and abettor unless it owed the Eatons a duty to disclose to them information material to the partnerships. The Eatons suggest that because National Union had underwriting guidelines, reviewed the PPMs, and (according to Mr. Marvin–Smith) approved the partnerships for financing, "it was not unreasonable for the defendants to assume that National Union carefully checked out the general partner and the deals prior to underwriting them." (Defendants' Memorandum, p. 5)

Regardless of any actions National Union may have taken or guidelines it may have followed in assessing its own risks in guaranteeing the notes, its duty to defendants is defined by its agreements with them, the bonds and the indemnity agreements. As their surety, National Union guaranteed that those investors who had elected to buy partnership interests would make the required capital contributions and that if they did not, National Union would make the payments on their behalf. Unless, by its own actions, National Union misled defendants it cannot be held responsible for any assumptions defendants made.

Comparing cases holding that the alleged aider owed and breached a duty with cases holding there was no duty breached demon-

strates that National Union's review of the PPMs for its own purposes did not require it to disclose any information to the Eatons. On the one hand are *Securities and Exchange Commission v. Washington Co. Utility District,* 676 F.2d at 224 (manager of public utility district had duty to disclose kickback from underwriter of bond); *Edward J. Mawod & Co. v. Securities and Exchange Commission,* 591 F.2d 588, 596 (10th Cir.1979) ("where brokers are obligated to investigate, the failure to do so subjects them to a holding that they acted wilfully"); *Klein v. Computer Devices,* 591 F.Supp. at 280 (duty was breached where aider "participated in the preparation and review of the allegedly defective prospectus and ... actively promoted the sale of shares ... by, for example, orchestrating the entire transaction, placing advertisements and processing purchase orders"); *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793 (holding bank liable for making loan to company and then demanding continuation of program where employees, without any financial information, traded earnings for unregistered subordinated promissory notes); *Morgan v. Prudential Group, Inc.,* 527 F.Supp. at 961 (S.D.N.Y.1981) (counsel who prepares tax opinion for prospectus has duty to investors); *Securities and Exchange Commission v. National Student Marketing Corp.,* 457 F.Supp. 682 (merging corporation's president and counsel had duty to disclose altered financial data to shareholders). On the other hand are *Delany v. Blunt, Ellis & Loewi,* 631 F.Supp. 175 (bank which made loan to investor in limited partnership and made separate loan to partnership did not have duty to inform investor of cross-default provision which allowed bank to accelerate due date on investor's loan and draw upon investor's collateral in event partnership defaulted on its loan); *Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235 (S.D.N.Y.1984) (dismissing complaint against attorney for limited partnership who remained silent in order to assist general partner's scheme to defraud); *Hudson v. Capital Management International, Inc.,* 565 F.Supp. at 623 (accountant, attorney, and underwriters, who did not possess inside information or knowingly participate in a fraudulent scheme, had no duty to disclose information in limited partnership prospectus); *Schlifke v. Seafirst Corp.,* [1987] Fed.Sec.L.Rep. (CCH) ¶ 93,107, at 95,443 [1987 WL 4718] ("even if [the investors] could establish that [the aider] had knowledge of material misrepresentations or omissions by [the primary violator], since [the aider] had no independent duty to assure that [the primary violator] properly transmitted all relevant information to the investors, the alleged 'nondisclosures' by [the aider] do not provide the 'substantial assistance' requisite to an aiding and abetting claim"); *In re Gap Stores Litigation,* 457 F.Supp. 1135 (N.D. Cal.1978) (vice president who reviewed defective prospectus and failed to take action owed only the duty not to misrepresent facts to prospective purchasers); *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 549 (S.D. N.Y.1977) (mere possession of adverse information does not require independent auditor to disclose it).

Lacking a duty to disclose, National Union is not liable for aiding and abetting the primary violation unless it is shown to have known of the alleged misstatements or omissions in the PPMs and to have had a "conscious and specific motivation for not acting." *IIT v. Cornfeld,* 619 F.2d at 927; *accord Wright v. Schock,* 571 F.Supp. 642, 663 (N.D.Cal.1983) ("Missing here is any evidence that the banks and title companies sought some benefit to themselves from the consummation of [the] alleged fraud, which might convert silence and inaction into substantial assistance"), *aff'd,* 742 F.Supp. 541 (9th Cir.1984). No such evidence is proffered.

Nor is it enough that National Union's usual practice of issuing the bonds enabled the transactions to go forward. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 63 (2d Cir.1985) ("Allegations of a 'but for' causal relationship are insufficient" for aiding and abetting liability) (citing *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731

(1980)); *Delany v. Blunt, Ellis & Loewi*, 631 F.Supp. at 181 ("mere act of extending financing does not form the basis for an implication of the 'substantial assistance' required for aiding and abetting liability"). Since the Barrick Group was not National Union's agent and National Union had no duty to disclose any documents to defendants, it cannot be held liable for the partnership's failure to disclose material documents, Mr. Barth's tax situation or his "illegal dealings," asserted conflicts of interest, or other "facts concerning the investments."

### RICO

18 U.S.C. § 1964(c) allows for civil enforcement of RICO's provisions:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in an appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Evidence of a violation of section 1962(c)[7] "requires a showing of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted).

Racketeering activity is the commission of certain predicate acts, specified in the statute, for which a defendant could be convicted, *id.* at 488, 105 S.Ct. at 3280–81, and a pattern of activity requires proof of at least two such acts, 18 U.S.C. § 1961(5). Any predicate act violation which requires an allegation of fraudulent conduct must meet Fed.R.Civ.P. 9(b)'s particularity requirement.

Section 1961(4) includes as an enterprise "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The RICO enterprise is defined as a "group of persons associated together for a common purpose of engaging in a course of conduct" and "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981).

The Eatons define the RICO enterprise as "the Barrick Group offerings of fraudulent securities in interstate commerce with National Union acting as surety on the investor notes." (Defendants' Memorandum, p. 20) The Eatons contend that the predicate act violations include mail and wire fraud, 18 U.S.C. §§ 1341, 1343, fraudulent offerings of securities in interstate commerce, 18 U.S.C. § 1961(1)(D), and obstruction of justice, 18 U.S.C. § 1503.[8]

### I. Mail and Wire Fraud

 The Eatons claim that

Every time the U.S. Mail played host to one of these fraudulent PPMs, surety forms, UCC forms, correspondence, "Remarketing Agreements", "General Partner's Indemnity Agreement" and the numerous other documents that were mailed to or from the defendants and other swindled investors and between National Union and the Barrick Group in connection with these fraudulent offerings, the plaintiff committed a predicate act under the RICO statute ...

Every time George Marvin–Smith said anything to induce the defendants to purchase this fraudulent investment a predicate act was committed under 18 U.S.C.A. § 1343 Wire Fraud. (Defendants' Memorandum, p. 21)

---

**7.** Although the Eatons do not specify under which sub-section of section 1962 their counterclaim is made, only sub-section 1962(c) could conceivably apply here. It provides:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**8.** Violations of each of these statutes are included in the definition of racketeering activity. 18 U.S.C. § 1961(1)(A).

To prove the predicate offenses of mail and wire fraud, defendants must establish: (1) " 'a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme.' A scheme to defraud is a plan whose object is 'to deprive one of property through fraudulent or deceptive means, such as material misrepresentations [or] concealment.' " *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. at 512 (quoting *Tryco Trucking Co. v. Belk Stores Services*, 634 F.Supp. 1327, 1333 (W.D.N.C.1986)).

Since, as discussed above, National Union is not shown to have engaged in a scheme to defraud the Eatons through fraudulent or deceptive means, defendants cannot establish mail and wire fraud violations by National Union.

## II. Fraudulent Offerings of Securities

■ The Eatons contend that "[e]very time a fraudulent PPM was delivered to the defendants and other swindled investors a predicate act was committed under 18 U.S.C.A. § 1961D." (Defendants' Memorandum, p. 22)[9] As discussed above, National Union is not shown to be liable for acts committed by the Barrick Group.

## III. Obstruction of Justice

■ The Eatons contend that "National Union's coverup of the Barrick Jacksonville swindle constitutes obstruction of justice amounting to a predicate act under 18 U.S.C.A. § 1503[10] ... [insofar as] the coverup enabled Leslie R. Barth to loot the defendants' partnerships and enabled him to continue to mismanage them leading to the ultimate failure of the partnerships." (Defendants' Memorandum, p. 22)

The Eatons were not investors in Barrick Jacksonville (another Barrick Group limited partnership), and have not demonstrated how any swindle involving that investment injured them. *See Sperber v. Boesky*, 849 F.2d 60, 64 (2d Cir.1988) ("A defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, but only to anyone whose injuries were caused by reason of" the violation) (citation omitted).

## Negligence

■ As has already been discussed, National Union cannot be held liable for any acts of Leslie Barth or the Barrick Group (because neither was National Union's agent), nor for a breach of a duty to disclose adverse information about the partnerships (because it did not owe such a duty to defendants). The Eatons, however, allege that National Union should be held liable because it "failed to exercise any degree of care and diligence as the surety for the Barrick partnerships." (Counterclaim, p. 3) In their memorandum, the Eatons state:

National Union had a duty to the defendants to issue the bond with due care. As a matter of written procedure National Union exercised their [sic] duty of due care by demanding that the partnership furnish a legal memorandum by its law firm certifying that a number of conditions precedent to the issuance of the bond were met.... The conduct of National Union is [sic] accepting such a legal opinion [drafted by an attorney affiliated with the partnership] and on the basis of such an opinion binding the limited partners to indemnification and pledge agreements is clearly reckless and wanton. (Defendants' Memorandum, p. 11, 12)

But National Union may only be held liable if it breached a duty it owed the Eatons as their surety. (Plaintiff's Memorandum, p. 15):

The scope of the risk assumed by National Union and the legal relationship between National Union and defendants are clearly and exclusively established by the written documents to which they are parties—the Bonds and Indemnity Agreements and defendants' confidential questionnaires. Absent ambiguities in those documents (and defendants herein

---

**9.** Section 1961(1)(D) states that the definition of "racketeering activity" includes "any offense involving ... fraud in the sale of securities."

**10.** 18 U.S.C. § 1503 is entitled "Influencing or injuring officer or juror generally."

point to none), the duties and the obligations of the parties cannot be expanded.

*See also In re Gas Reclamation, Inc. Securities Litigation,* 659 F.Supp. at 506 (if no duty to disclose under federal securities laws, court should dismiss claim of common law fraud).

## CONCLUSION

The Eatons have failed to establish that the Barrick Group acted as National Union's agent, and that National Union owed them a duty of disclosure, aided and abetted a securities law violation, acted negligently, or engaged in a pattern of racketeering activity. Accordingly, the counterclaim is dismissed.