917 So.2d 368 (2005)
ZP NO. 54 LIMITED PARTNERSHIP, et al., Appellant,
v.
FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellee.
No. 5D05-322.
District Court of Appeal of Florida, Fifth District.
December 30, 2005.
*369 Stephen M. Reams and Robert L. Crewdson of Alston & Bird, LLP, Atlanta, GA and Darryl M. Bloodworth of Dean, Mead, Egerton, Bloodworth, Copouano & Bozarth, P.A., Orlando, for Appellant.
Matthew C. Bothwell and John E. Hilser of Harry R. Blackburn & Associates, P.C., Melbourne, for Appellee.
MONACO, J.
Appellants, ZP No. 54 Limited Partnership, ZP No. 52 Limited Partnership, and ZP No. 56 Limited Partnership, each owned by Jeffrey Zimmer (collectively referred to as "Zimmer"), brought suit against Fidelity and Deposit Company of Maryland for damages arising from a construction performance bond contract, as well as for three alternative torts: aiding and abetting a fraud, gross negligence and negligent misrepresentation. Fidelity and Deposit Company acquired Mountbatten Surety Company (collectively, "Mountbatten"), after the occurrence of the events *370 that gave rise to this suit. Zimmer alleges that Mountbatten's involvement in issuing performance and payment bonds to Arlen Group, Inc. ("Arlen Group"), assisted the Arlen Group in successfully perpetrating a bid-rigging scheme against Zimmer. Although the contract count on the bond remains in effect, the trial court granted a summary judgment on the three tort claims pled by Zimmer. Zimmer appeals the summary judgment. We have jurisdiction pursuant to Rule 9.110(k), Florida Rules of Appellate Procedure.
Zimmer planned to build three shopping centers in the Orlando area, and assigned their employee, Frank Grzandziel, to oversee the contractor bidding process. Through the efforts of Mr. Grzandziel, Zimmer contracted with the Arlen Group to be its general contractor in connection with the construction of the three projects. According to the complaint, Mr. Grzandziel in exchange for substantial kickbacks conspired with the Arlen Group to rig the bidding process in order to inflate the prices of the projects and consequently to pocket large sums of money for themselves. In order to win the contracts for the Zimmer projects, Zimmer alleges that the Arlen Group was required to obtain performance and payment surety bonds. Mountbatten eventually provided the Arlen Group with the bonds, naming Zimmer as the obligee on each bond.
Zimmer contends, more specifically, that its designated representative on the projects, Frank Grzandziel, cooked up the bid-rigging scheme in order to defraud Zimmer. Instead of bidding out the work competitively, Mr. Grzandziel is alleged to have negotiated vastly inflated prices on the projects with the Arlen Group in exchange for kickbacks. In point of fact, Mr. Grzandziel eventually pled guilty to wire fraud[1] in federal court, and acknowledged his role in the defrauding of Zimmer in an amount not more than two million dollars.
The Grzandziel/Arlen Group scheme began to fall apart when during the prosecution of the work, disputes arose between Zimmer and the contractor, resulting in the Arlen Group's ceasing work on the projects. The projects at that point were at various stages of completion. Zimmer contends creatively that in addition to liability under the terms of the performance bonds issued by Mountbatten, the surety also has tort liability arising out of its underwriting and ultimate decision to issue the bonds.
Zimmer alleges, more particularly, that when Mountbatten issued the bonds, it knew or should have known that the Arlen Group was a sham construction contractor, not licensed in Florida, or any other state for that matter, and not at all bondable. The Arlen Group's activities allegedly left tell-tale "red flags," which should have revealed the fraudulent nature of its business to Mountbatten. According to Zimmer, Mountbatten failed to perform its underwriting investigation in a thorough manner prior to issuing the performance bonds to the general contractor. In the language of legal theory, Zimmer asserts that Mountbatten aided and abetted the fraud perpetrated on Zimmer by issuing the bonds upon which Zimmer relied in awarding the three contracts to the Arlen Group.
In support of its position, Zimmer submitted to the trial court the affidavit of an expert in underwriting, one George Beutner. Mr. Beutner concluded that a reasonable underwriter would not have bonded the Arlen Group. His review of the underwriting files of Mountbatten and the depositions of various employees of Mountbatten *371 and the Arlen Group caused him to opine that Mountbatten was "grossly negligent in its underwriting of Arlen." He concluded, as well, that the underwriting did not meet the standard of care typically employed by surety underwriters, and that several "red flags" should have tipped off Mountbatten to the fraudulent activity afoot. Pointedly, although Mr. Beutner accuses Mountbatten of gross negligence and even reckless behavior in the underwriting, he does not say specifically that Mountbatten had actual knowledge of the fraud.
According to Zimmer, the Arlen Group's financial data and information disclosed that it had a negative net worth; had no ongoing construction projects; had no experienced personnel, no equipment and no office; had never performed a project as big as the three Zimmer projects; was not licensed as a general contractor in Florida; had never worked in the Southeast; had never worked for owners other than those that employed Grzandziel; had made up to 70% more profits than market norms; had no intention to capitalize; and had a practice of removing profits and capital from its accounts at the earliest possible occasion. The complaint alleges that a year after Zimmer awarded the first project to the Arlen Group, Zimmer learned the truth about its general contractor. Because the Arlen Group did not complete construction on the projects, Zimmer is purported to have lost approximately $3,000,000 in damages for the delay and cost of completion.
Zimmer originally filed an action against Mountbatten seeking only to recover contract damages on the performance bonds. It later amended the complaint to include its tort claims, and to request punitive damages related to the gross negligence claim. After the pleadings were complete, Mountbatten filed a motion for summary judgment claiming that no genuine issue of material fact existed on the tort claims because Zimmer failed to allege that Mountbatten owed a duty to Zimmer. Mountbatten contends that Zimmer failed to put forth facts sufficient to establish that Mountbatten had the requisite knowledge that Arlen was engaged in fraudulent activity. With respect to the charge of negligent misrepresentation, Mountbatten asserts that Zimmer did not allege any statement of misrepresentation.
The trial court granted a partial final judgment against Zimmer on all of the tort claims. The court said, disturbingly, that there was "insufficient evidence" to establish aiding and abetting, specifically because the evidence failed to establish that Mountbatten had actual knowledge of the fraud alleged or that Mountbatten substantially assisted Arlen in the alleged fraud. The trial court held that "recklessness does not suffice as to the knowledge element of the alleged fraud." Regarding the other two tort claims, the trial court found that Mountbatten did not owe any duty to Zimmer with respect to its underwriting or issuance of bonds, and that the existence of a duty is an element of both negligent misrepresentation and gross negligence. It, thus, concluded that summary judgment was appropriate.

A. The claim for aiding and abetting a fraud.
Zimmer postulates that the material facts before the trial court were sufficient to withstand a summary judgment challenge to its cause of action for aiding and abetting a fraud. We disagree.
A review of the case law suggests that, despite a dearth of authority, aiding and abetting a fraud may well be a valid cause of action in Florida. In Freeman v. First Union Nat'l Bank, 865 So.2d 1272 (Fla. 2004), for example, the Florida Supreme *372 Court responded to a certified question from the United States Court of Appeals for the Eleventh Circuit by holding that Florida's version of the Uniform Fraudulent Transfer Act ("UFTA")[2], does not provide a vehicle by which a person could bring a suit against a non-transferee party for damages arising from that party's alleged aiding and abetting of a fraudulent money transfer. In doing so, however, the high court quoted language used by the United States District Court that had considered the case prior to the certification by the Eleventh Circuit to the effect that, "[e]very case cited by Plaintiffs recognizes aiding and abetting common law fraud, or another cause of action, but not an UFTA violation." Id. at 1275. Cf. Freeman v. Dean Witter Reynolds, Inc., 865 So.2d 543, 554 (Fla. 2d DCA 2003) ("[w]hether the specific cause of action for aiding and abetting a fraudulent transfer exists will depend upon the Florida Supreme Court's pending decision in Freeman v. First Union National Bank"). See also Bankfirst v. UBS Paine Webber, Inc., 842 So.2d 155 (Fla. 5th DCA 2003). Similarly, the federal district court in Tew v. Chase Manhattan Bank, N.A., 728 F.Supp. 1551 (S.D.Fla.1990), appears to have recognized the viability of the cause of action by holding that a summary judgment was inappropriate to eliminate a count for aiding and abetting a fraud because of the existence of factual issues to be decided by a jury. Id. at 1568-1569.
Despite our conclusion that aiding and abetting fraud might be a tort in Florida, we also conclude that if such a cause of action does exist, the material facts in the present case are not within its ambit. We come to this conclusion for two reasons, both of which involve an analysis of the elements of the tort.
Virtually all courts that have acknowledged the existence of aiding and abetting a fraud state that the following are the elements that must be established by the plaintiff:
1. There existed an underlying fraud;
2. The defendant had knowledge of the fraud;
3. The defendant provided substantial assistance to advance the commission of the fraud.
See Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir.2000); In re WorldCom, Inc. Secs. Litigation, 382 F.Supp.2d 549 (S.D.N.Y.2005); VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F.Supp.2d 255 (S.D.N.Y.2004); Tew, 728 F.Supp. at 1560; Thornwood, Inc. v. Jenner & Block, 344 Ill.App.3d 15, 278 Ill.Dec. 891, 799 N.E.2d 756 (2003). In the present case, the third element is missing.[3]
We conclude that the undisputed facts reflect that Mountbatten did not provide substantial assistance to advance the commission of the alleged fraud by simply issuing the performance bonds. We begin with the notion that Zimmer, the owner, had no right to rely on the issuance of a performance bond as an assurance that its own employees were honest. After all, it was Zimmer that hired Mr. Grzandziel, the person who allegedly cooked up the kickback scheme, and it was Zimmer that signed the three construction contracts with a general contractor who was not only unlicensed in Florida, but also came into the deal with all the other thorns previously described.
*373 More particularly, a performance bond is not designed or intended to protect an owner from his own folly or lack of due diligence. It is issued for the purpose of assuring that the project will be completed in the event that the general contractor fails to do so.
The purpose of a performance bond is to guarantee the completion of a contract upon default by the contractor. Ordinarily a performance bond only ensures the completion of the contract. The surety agrees to complete the construction or to pay the oblige the reasonable costs of completion if the contractor defaults.
See American Home Assur. Co. v. Larkin Gen. Hosp., Ltd., 593 So.2d 195, 198 (Fla. 1992).
Said more obliquely, Mountbatten had no duty to look behind the contracts to determine whether Zimmer's own employee was committing a fraud. Its function was to issue performance bonds, and to pay on the bonds if properly called upon to do so. It was not in the business of supplying information to third parties about the qualifications of the general contractor, or about the morality or honesty of the owner's employees. Zimmer claims in its briefs that its case against Mountbatten is not based on a duty to disclose, perhaps implying that there was no duty to disclose. Cf. FLA Orthopedics, Inc. v. American Ins. Co., 896 So.2d 1, 7 (Fla. 3d DCA 2004). Rather, it argues only that Mountbatten assisted or furthered the fraud by issuing the performance bonds.
Companies that issue performance bonds undertake their underwriting, and make risk decisions for their own purposes. Mountbatten, as it turns out, is a "B Market Surety," and is, more specifically, in the business of writing performance bonds for "unbondable contractors." The general contractor, the Arlen Group, is a broker-contractor that bids out all or most of its work. That Mountbatten chose to take a financial risk, even a really bad one, does not permit the owner to expect that it is vouching for the honesty of the owner's employees, or that it had entered into a reasonably priced contract.
The issue of whether a third party can rely on the underwriting efforts of a surety, while not previously addressed by Florida appellate courts, has been treated by the courts of other jurisdictions. In most instances, those jurisdictions have declined to sanction such reliance. See e.g., National Union Fire Ins. Co. of Pittsburg, Pa. v. Arioli, 941 F.Supp. 646 (E.D.Mich. 1996); Cf. Safeco Ins. Co. of America v. Dain Bosworth, Inc., 531 N.W.2d 867 (Minn.App.1995). In National Union Fire Ins. Co. of Pittsburgh, Pa. v. Eaton, 701 F.Supp. 1031 (S.D.N.Y.1988), one of the clearest cases on the subject, a federal court considered whether a third-party could rely on the underwriting actions of a surety that had issued bonds guaranteeing certain capital contributions. In concluding that third-parties could not rely on the underwriting of a surety, the court explained:
The Eaton's assumption that they were entitled to rely upon National Union's status and its actions rests on the mistaken premise that National Union owed them a duty. Unfortunately for defendants, National Union did not undertake to furnish them the solicitude or protection which they may have expected. National Union had an interest in investigating the partnerships to avoid becoming obligated to a stream of future payments if the limited partners should default, an event which would most likely occur only if the enterprise failed and the limited partners abandoned it. The research efforts National expended were solely for its own purposes; it assumed *374 no obligation to inform others of the investments' merits or infirmities.
If the defendants drew the conclusion from National Union's guarantee of their own promises to pay that the investment would prosper, they did so at their own risk. That conclusion may have seemed reasonable enough, but National Union owed them no duty either to investigate the partnerships or to make disclosures about the investment.
Id. at 1034.
In the present case, the same reasoning applies. Mountbatten's underwriting was for its own purposes. Its investigation was to minimize the risk that it would have to pay on the bonds. Zimmer was not privileged to rely on the thoroughness or reasonability of the underwriting. If it drew conclusions about the character or honesty of its employee or of the general contractor from the issuance of the bonds, it did so at its own risk.
We conclude, therefore, that the issuance of the bonds alone could not provide the substantial assistance required to advance the commission of the fraud, and that the third element of the tort is, thus, not satisfied as a matter of law. This being the case, a summary judgment on the aiding and abetting count was in order and appropriately granted.

B. The claims for gross negligence and negligent misrepresentation.
Zimmer sought alternative relief on its claims that Mountbatten was grossly negligent in the underwriting and issuance of the performance bonds, thus allowing the thefts to occur, or was guilty of negligent misrepresentation with respect to its issuance of the bonds. The trial court rendered a summary judgment on these counts based on the lack of a legal duty that Mountbatten had to Zimmer. We think the trial court got it right. The only legal duty that Mountbatten had to Zimmer discernable from the specific facts of this case was to fulfill its express obligations under the performance bonds
Both of the alternative tort claims sound in negligence. It goes without saying that in order to succeed in these claims Zimmer would have to demonstrate that Mountbatten owed it a duty of care. See Gilchrist Timber Co. v. ITT Rayonier, Inc., 696 So.2d 334 (Fla.1997); Jenkins v. W.L. Roberts, Inc., 851 So.2d 781 (Fla. 1st DCA 2003); Lawlor v. Orlando, 795 So.2d 147 (Fla. 1st DCA 2001). If no duty exists, the negligence based claims must fail.
To determine whether a duty sufficient to support a negligence claim exists, one begins by determining whether the defendant by its conduct created a foreseeable zone of risk. See McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992); Paszamant v. Ret. Accounts, Inc., 776 So.2d 1049 (Fla. 5th DCA 2001). Zimmer posits that Mountbatten created a foreseeable zone of risk by issuing the performance bonds to an entity that it knew or should have known was "unbondable," and that was arguably involved in illicit activity. As we suggested in our analysis of the aiding and abetting count, however, we do not conclude that a duty was created simply by issuing the bonds.
We are guided to this conclusion by the case of FLA Orthopedics, a case also relied upon by the trial court in rendering its judgment. While FLA Orthopedics is a negligent misrepresentation case, we think its lessons apply here. The issue there was whether an insurer, which had issued an errors and omissions policy to a manufacturer's group insurance plan provider, had implicitly represented that the now insolvent provider was licensed to transact business in Florida. The Third District Court held that the plaintiff could not establish *375 its claim as a matter of law because TAIC, the insurance company "is in the business of selling insurance, and is not in the business of supplying information to third persons about its insureds' business qualifications." Id. at 4. The Third District said cogently:
[T]he expert's opinions that a professional liability insurer, like TAIC, "knows or should know that third parties rely on the existence of error and omission coverage," and that "TAIC should have known that [its insured] was not authorized under Florida law to transact insurance business," are insufficient to create a legal duty or issue of fact to preclude summary judgment.
Id. at 4. See also Reimsnyder v. Southtrust Bank, N.A., 846 So.2d 1264 (Fla. 4th DCA 2003). The FLA Orthopedics analysis is persuasive.
Likewise, although we have found no Florida case that has specifically determined whether a surety has a duty to third parties growing out of its underwriting activities, a number of federal and state courts seem to have rejected that notion. See e.g., Arioli; Eaton. Cf. Dain Bosworth. Issuing a bond based on bad underwriting does not create a foreseeable zone of risk because a person receiving the benefit of the bond simply does not have the right to rely on the competence of the underwriting. A person relying on the bond has the right to expect that the bond will be honored by its issuer according to its terms. Thus, we reject the invitation to find that sureties have a duty to third parties as a result of its underwriting activities.

C. Conclusion.
We conclude, therefore, that the trial court properly granted summary judgment on each of the tort counts sought to be established by Zimmer. We express no opinion concerning the contract count as it has not been brought to us for such purpose.
AFFIRMED.
THOMPSON and PALMER, JJ., concur.
NOTES
[1] 18 U.S.C. § 1343.
[2] Fla. Stat. Ch. 726.
[3] While we have some serious doubts regarding whether the second element was satisfied, we need not reach that issue because of the failure of the third element.