[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14944
_____

D.C. Docket No. 6:14-cv-00121-ACC-KRS


WILLIAM M. FREEMAN,

Plaintiff - Appellant,

versus

JPMORGAN CHASE BANK N.A.,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 13, 2017)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and UNGARO,*
District Judge.

PER CURIAM:

This case requires us to consider whether the district court properly applied

the summary judgment standard to plaintiff William Freeman's negligence and

aiding and abetting claims against defendant JPMorgan Chase Bank, N.A., after

fraudster Charles Gordon stole money that Freeman had deposited in an account

owned by Gordon's company, OPT Title & Escrow, Inc.  Because Freeman met

his burden of coming forward with evidence showing that OPT Title owed him a

fiduciary duty, the Bank knew or should have known that OPT Title was holding

Freeman's money in escrow, and the Bank knew Gordon was stealing money from

OPT Title's account, the district court should have denied the Bank's summary

judgment motion.  Accordingly, we reverse and remand for further proceedings.

## I.    BACKGROUND

### A.    Factual Background

This case arises out of Gordon's fraudulent scheme, which we described in

*Chang v. JPMorgan Chase Bank, N.A.*, Nos. 15-13636, 15-14529, __ F.3d __,

2017 WL 65371 (11th Cir. Jan. 6, 2017).  Briefly stated, Gordon owned and

operated OPT Title, a Florida corporation, and Ziggurat (Panama), S.A., a

Panamanian corporation.  Ziggurat's purported business was to secure for its

clients multi-million dollar loans from global banking institutions and

2

underwriters.[1]  Gordon told Ziggurat's clients that because the lenders required proof of their liquidity to obtain financing, the clients needed to deposit a percentage of the total amount to be financed in an escrow account OPT Title maintained with the Bank.  Gordon had clients transfer the escrow funds into an account at the Bank titled "OPT Title & Escrow Inc Escrow Account" (the "OPT Escrow Account").  Instead of holding the funds in escrow, however, Gordon diverted the money to pay Ziggurat's operating expenses and his personal expenses.  Under this scheme, Gordon stole more than $3 million.

Roland Larsen, an acquaintance of Freeman, wanted Ziggurat to secure $100 million in financing so that he could develop a project mining coal and drilling for natural gas in West Virginia.  He asked Freeman to provide $1 million to fund the escrow deposit for his company, Sharpe Resources, Inc.  In September 2011, Freeman and Larsen, on behalf of Sharpe Resources, entered into a written agreement in which Freeman would provide $1 million in escrow funds that would be paid back if Ziggurat failed to obtain the financing.  If Ziggurat obtained the financing, Freeman would receive his money back plus $1 million in interest.  The day after signing the agreement, Freeman wired $1 million to the OPT Escrow Account.

---

[1] Because Freeman appeals the district court's grant of summary judgment, we view the evidence related to those claims in the light most favorable to Freeman, the non-movant.  *See Valderrama v. Rousseau*, 780 F.3d 1108, 1110 n.1 (11th Cir. 2015).

A few days later, Larsen decided that he needed Ziggurat to finance an additional $30 million. To increase the financed amount, Larsen needed to deposit an additional $300,000 in the OPT Escrow Account. Freeman agreed to provide the money. Freeman and Larsen, on behalf of Sharpe Resources, amended their agreement to reflect the additional money Freeman had provided and that Freeman would receive an additional $300,000 if Ziggurat successfully obtained the financing. The next day, Freeman wired $300,000 to the OPT Escrow Account.

After Freeman sent the money, Larsen decided to use a different company he controlled, Standard Energy Company, as the party to the transaction with Ziggurat. The day after Freeman sent the second wire, Larsen, on behalf of Standard Energy, and Ziggurat entered into a Memorandum of Understanding in which Ziggurat promised to work to secure funding for Standard Energy and Standard Energy agreed to place 1% of the requested loan amount in escrow with OPT Title.

Larsen, on behalf of Standard Energy, also entered into an escrow agreement with OPT Title. OPT Title promised not to use the money for any purpose other than as set forth in the Memorandum of Understanding between Ziggurat and Standard Energy. OPT Title further agreed that "[i]n all instances, the Escrow, or part thereof, will be returned to the same account of origination." Escrow

4

Agreement ¶ 2.1.6 (Doc. 95-26).[2]  Because OPT Title had received the money directly from Freeman, it in effect pledged to return the $1.3 million to Freeman, even though he was not a party to the escrow agreement.  Despite these promises, OPT Title did not hold Freeman's money in escrow.  Instead, Gordon stole the money.

Gordon was able to steal money OPT Title was holding in escrow at least in part because of knowing assistance he received from Olga Padgett-Perdomo, a Bank vice president beginning in 2009.  She helped him by opening the OPT Escrow Account, persuading potential targets that their money would be safe in the OPT Escrow Account, and trying to keep other Bank employees from investigating OPT Title's accounts.

First, she assisted Gordon in 2009 by opening OPT Title's accounts with the Bank.  She allowed Gordon to name one of the accounts an escrow account, even though she and Gordon failed to comply with the Bank's procedures for opening escrow accounts.

Second, she helped Gordon thereafter by reassuring potential victims that the money they sent to the OPT Escrow Account would be safe and lying to them to cover up that Gordon had stolen their money.  When investor Hsi Chang was considering whether to fund a $750,000 liquidity deposit for another project

---

[2] Citations to "Doc." refer to docket entries in the district court record in this case.

Ziggurat was financing, Padgett-Perdomo met with Chris Lim and William Lin, who were working with Chang. She assured them that OPT Title had an excellent relationship with the Bank and praised OPT Title's business. When they showed her a copy of Chang's escrow agreement with OPT Title, which reflected that OPT Title would hold Chang's money in escrow at the Bank, Padgett-Perdomo reassured them that OPT Title held money in escrow for others who were obtaining financing with Ziggurat. After Chang sent the money, Lim and Lin would occasionally call Padgett-Perdomo to check whether OPT Title was continuing to hold Chang's money in escrow. She continued to assure them that Chang's money was safe, even though Gordon had already stolen it.[3]

Padgett-Perdomo assisted Gordon by making other representations about OPT Title. Almost immediately after OPT Title opened its accounts at the Bank, Padgett-Perdomo wrote letters vouching for OPT Title. In these letters, she stated that OPT Title maintained excellent relationships with the Bank, without mentioning that OPT Title had been a Bank customer only for a few days. Padgett-Perdomo also wrote another letter, in October 2010, on the Bank's letterhead (the "Seven-digit Letter") representing that OPT Title's "[e]scrow

---

[3] In a separate lawsuit, Chang sued the Bank. Although the district court dismissed Chang's claims, we reversed because Chang had stated claims for relief against the Bank for negligence, gross negligence, aiding and abetting fraud, and aiding and abetting conversion. *See Chang*, 2017 WL 65371, at *1.

6

account currently has deposits . . . in the seven digit amounts" when in fact the total balance in all OPT Title's accounts with the Bank at that time was less than $100,000. Seven-digit Letter (Doc. No. 85-3).

Third, Padgett-Perdomo assisted Gordon in 2010 by trying to keep other Bank employees from investigating the OPT Escrow Account. When a customer brought the Seven-digit Letter to another Bank branch and asked whether the information in the letter was accurate, a Bank employee recognized the inaccuracy of Padgett-Perdomo's statement in the letter that the OPT Escrow Account had a balance of over a million dollars. When the employee confronted Padgett-Perdomo about the letter, Padgett-Perdomo claimed that she had written it several years earlier and that OPT Title no longer kept seven digit balances with the Bank. She insisted that the employee allow her to handle the matter. When the Bank first investigated the Seven-digit Letter, Padgett-Perdomo stated that she had written it in 2009, but later denied writing the letter at all.

In exchange for her ongoing assistance in the fraudulent scheme, Gordon paid Padgett-Perdomo $100,000. In June 2010, Gordon wired the money to an entity Padgett-Perdomo controlled, Infinit Management. The next day Padgett-Perdomo transferred nearly all the money to Colombia so that her parents could purchase a home. Although Padgett-Perdomo contends that the money was a loan

from Gordon, there was no written loan agreement or agreed-upon repayment terms, and she has never repaid Gordon.

## B.    Procedural History

Freeman sued the Bank in federal court asserting state-law claims for negligence, gross negligence, aiding and abetting fraud, and aiding and abetting conversion. After discovery, the Bank moved for summary judgment. The district court granted summary judgment to the Bank on all of Freeman's claims.

With respect to the negligence and gross negligence claims, the district court determined that Freeman had failed to come forward with evidence establishing that the Bank owed him a duty. The district court explained that because Freeman was not a Bank customer, the Bank owed him a duty only if there was a fiduciary relationship between OPT Title and Freeman, the Bank knew or ought to have known of the fiduciary relationship, and the Bank actually knew that Gordon was misappropriating money. The district court concluded that Freeman failed to show he had a fiduciary relationship with OPT Title because only OPT Title and Standard Energy were parties to the escrow agreement. Thus, the Bank did not owe him a duty, and the district court granted summary judgment to the Bank on the negligence and gross negligence claims.

With respect to the aiding and abetting claims, the district court determined the claims failed because Freeman had come forward with no evidence showing

8

that the Bank had actual knowledge of Gordon's fraud or gave substantial assistance to Gordon. Although Freeman argued that Padgett-Perdomo's knowledge of the fraud should be imputed to the Bank, the district court found the evidence did not support an inference that she knew about Gordon's scheme. The court refused to consider any evidence related to Chang, even though the evidence could be relevant to establish what Padgett-Perdomo knew about Gordon's scheme, because the court found the probative value of the evidence was substantially outweighed by its prejudicial effect. Alternatively, the district court concluded that even if Padgett-Perdomo knew about the fraud, her knowledge could not be imputed to the Bank because she acted solely to further her own interest.

Additionally, the court concluded that Freeman had failed to show that the Bank provided substantial assistance to Gordon because there was no evidence of the Bank having provided affirmative assistance to Gordon, and the Bank's inaction was insufficient because the Bank owed no duty to Freeman. On these grounds, the court granted summary to the Bank on the aiding and abetting claims. This is Freeman's appeal.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012).

We must "draw all inferences and review[] all evidence in the light most favorable to the non-moving party." *Id.* (alteration in original) (internal quotation marks omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Likes v. DHL Express (USA), Inc.*, 787 F.3d 1096, 1098 (11th Cir. 2015) (internal quotation marks omitted). Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

In this appeal, we must decide whether the district court erred in granting summary judgment to the Bank. Because Freeman came forward with sufficient evidence to support each of his claims, the district court erred in granting summary judgment.[4]

---

[4] The Bank also argues that we lack jurisdiction because Freeman has no standing to pursue these claims. The Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. To ensure that there is a case or controversy, a plaintiff must establish his standing as the proper party to bring suit. To establish standing, a plaintiff must show: "(1) he has suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the defendants' conduct; and (3) a favorable judgment is likely to redress the injury." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010).

## A.      Negligence Claim

Under Florida law, "[t]o maintain an action for negligence, a plaintiff must establish that the defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages."  *Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201, 204 (Fla. 2007).  As we explained in *Chang*, under Florida law a bank generally does not owe a duty of care to a noncustomer.  But under an exception to this rule, "a bank may be liable to a noncustomer for its customer's misappropriation when a fiduciary relationship exists between the customer and the noncustomer, the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation."  *Chang*, 2017 WL 65371 at *4.

The Bank contends that Freeman failed to offer evidence establishing an essential element of his case, that is, that the Bank owed him a duty.  We disagree. Freeman came forward with evidence showing that:  (1) OPT Title was holding the money in escrow for the benefit of Freeman; (2) the Bank, through Padgett-

---

The Bank contends that Freeman's injury is not fairly traceable to the Bank's conduct, but we disagree.  "A showing that an injury is 'fairly traceable' requires less than a showing of 'proximate cause.'" *Resnick v. AVMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012).  The fairly traceable requirement is satisfied even if a "plaintiff's injury is indirectly caused by a defendant's action." *Id.*  Freeman has shown that his injury is fairly traceable to the Bank's conduct because, as discussed below, the evidence, viewed in the light most favorable to Freeman, reflects that his money was stolen at least in part because the Bank allowed Gordon to continue to use the OPT Escrow Account, even though knowledge that Gordon was misappropriating money that OPT Title was supposed to be holding in escrow can be imputed to the Bank.

Perdomo, knew or should have known that OPT Title owed a fiduciary duty to Freeman when he wired money to the OPT Escrow Account; and (3) the Bank, through Padgett-Perdomo, knew that Gordon was misappropriating money from the account.  Under these facts, the Bank would owe Freeman a duty.

**1.    The Existence of a Fiduciary Relationship between Freeman and OPT Title**

Under Florida law, an escrow holder has "a fiduciary duty to exercise reasonable skill and ordinary diligence."  *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So. 2d 1063, 1064 (Fla. Dist. Ct. App. 1993).  An escrow holder may owe a fiduciary duty to a third-party beneficiary, even though he is not a party to the escrow agreement, when "the escrow agreement . . . show[ed] a clear intent to directly and substantially benefit" the third party.  *Id.* at 1065.

Viewing the evidence in the light most favorable to Freeman, OPT Title owed him a fiduciary duty because the escrow agreement between OPT Title and Standard Energy conferred a direct benefit upon Freeman.  In the escrow agreement, OPT Title agreed that the "Escrow, or part thereof, will be returned to the same account of origination."  Escrow Agreement at ¶ 2.1.6.  (Doc. No. 95-26). At the time OPT Title executed the escrow agreement, Freeman had already wired $1.3 million from his account to the OPT Escrow Account.  Under the terms of the escrow agreement, OPT Title promised to return the money directly to Freeman,

and thus it owed him a fiduciary duty, even though he was not a party to the escrow agreement.

### 2. The Bank's Knowledge of the Fiduciary Relationship

Freeman also came forward with evidence showing that the Bank knew or should have known about his fiduciary relationship with OPT Title. He showed that Padgett-Perdomo knew OPT Title was holding funds in escrow for third parties in the OPT Escrow Account and thus should have known about the fiduciary relationship between Freeman and OPT Title. In addition, he came forward with evidence that would allow Padgett-Perdomo's knowledge to be imputed to the Bank, her employer.

First, a reasonable jury could find that Padgett-Perdomo knew OPT Title was supposed to hold in escrow money deposited into the OPT Escrow Account. A jury could draw this conclusion from evidence that Padgett-Perdomo assisted Gordon in naming the account an "escrow account" and that, particularly as a Bank vice president, she understood OPT Title would hold the money deposited in the account in escrow. In addition, when she met with Lim and Lin, she reviewed a copy of the escrow agreement between Chang and OPT Title, told them that OPT

13

Title regularly held escrow funds in the account, and promised them Chang's

money would be safe in the escrow account.[5]

Second, Padgett-Perdomo's knowledge may be imputed to the Bank. Under

Florida law, her knowledge may be imputed to the Bank unless the adverse interest

exception applies, meaning her interests were entirely adverse to the Bank's

---

[5] In considering the summary judgment motion, the district court *sua sponte* refused to consider the evidence related to Chang because the court concluded under Federal Rule of Evidence 403 that the probative value of the evidence was outweighed by its prejudicial effect. We review this evidentiary ruling for abuse of discretion. *See Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1068 (11th Cir. 2014). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Id.* (internal quotation marks omitted). But when the district court excludes evidence without seeing the witnesses testify, such as at the summary judgment stage, we are "freer to perform the Rule 403 balancing *ab initio*." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983).

"Rule 403 is an extraordinary remedy which should be used sparingly" with a balance "struck in favor of admissibility." *Aycock*, 769 F.3d. at 1069 (internal quotation marks omitted). Evidence should be excluded under this rule "only when *unfair* prejudice *substantially* outweighs probative value." *Id.* (internal quotation marks omitted). "Rule 403's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* (internal quotation marks omitted).

The evidence regarding Padgett-Perdomo's involvement with Chang is essential to several elements of Freeman's claims, including that the Bank (through Padgett-Perdomo) knew or should have known that OPT Title owed a fiduciary duty to those who deposited money in the OPT Escrow Account and actually knew that Gordon was misappropriating money. The district court discounted the probative value of the evidence because Gordon had stolen Chang's money more than a year before Freeman wired his escrow money to OPT Title. But the district court overlooked that the evidence about Chang is probative because it shows the Bank knew for a year that Gordon was stealing money from the OPT Escrow Account but took no steps to stop him, which allowed him to continue to use the account for that purpose.

We cannot say that the admission of evidence about Chang would be unfairly prejudicial. The evidence suggests that Padgett-Perdomo (and the Bank) knew the details about Gordon's scheme, which is prejudicial to the Bank. But we cannot say that this evidence is *unfairly* prejudicial because the Bank's knowledge is at issue. Because the evidence is highly probative and not unfairly prejudicial, the district court applied the law in an unreasonable or incorrect manner and thus abused its discretion when it excluded this evidence under Rule 403.

14

interests and the Bank received no benefit whatsoever. *See Chang*, 2017 WL 65371, at \*4. As we explained in *Chang*, the adverse interest exception is inapplicable here because there is evidence that Padgett-Perdomo's actions assisting Gordon brought a short-term benefit to the Bank. *See id.* at \*5. With OPT Title as a customer, the Bank was able to collect revenue in the form of wire and service fees.

At the time that Freeman deposited his money, both Padgett-Perdomo and the Bank knew that OPT Title was acting as an escrow agent for those who deposited money in the OPT Escrow Account. Although Padgett-Perdomo was no longer working on OPT Title's account at the time Freeman deposited money into the OPT Escrow Account, Freeman came forward with evidence showing that the Bank knew or should have known that OPT Title owed a fiduciary duty to those, like Freeman, who wired money to the OPT Escrow Account.

### 3.    The Bank's Knowledge of Gordon's Misappropriation

Third, the evidence viewed in the light most favorable to Freeman reflects that the Bank, through Padgett-Perdomo, knew Gordon was misappropriating money held in the OPT Escrow Account. A reasonable jury could conclude that Padgett-Perdomo assisted Gordon in carrying out his fraud based on evidence showing she:  (1) allowed OPT Title to label its account as an escrow account, even though she and OPT Title had not complied with the Bank's procedures for

15

opening an authorized escrow account; (2) assured Lim and Lin before Chang wired money to the Bank that Chang's money would be safe in the OPT Escrow Account; (3) continued to tell Lim and Lin that Chang's money was being held in the OPT Escrow Account even though Gordon had stolen it; (4) wrote the Seven-digit Letter overstating the amount of money held in the OPT Escrow Account; (5) tried to prevent a Bank employee from investigating the OPT Escrow Account in connection with the Seven-digit Letter; and (6) surreptitiously received $100,000 from Gordon.  If Padgett-Perdomo was assisting Gordon in his fraudulent scheme, it follows that she knew Gordon was misappropriating money from the OPT Escrow Account.  In addition, Padgett-Perdomo's knowledge that Gordon had misappropriated the money can be imputed to the Bank for the reasons discussed in Section III.A.2 above

Although banks generally owe no duty to noncustomers, Freeman has come forward with evidence sufficient to establish that the Bank owed him a duty. Accordingly, the district court erred when it granted summary judgment on Freeman's negligence claim.[6]

---

[6] For the same reasons, the district court erred in granting summary judgment to the Bank on Freeman's gross negligence claim.

**B.    Aiding and Abetting Fraud**

We now turn to whether the district court erred in granting summary judgment to the Bank on Freeman's aiding and abetting fraud claim.  Although no Florida court has explicitly recognized a cause of action for aiding and abetting fraud, Florida courts have assumed that the cause of action exists.  *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So. 2d 368, 371-72 (Fla. Dist. Ct. App. 2005) (explaining that aiding and abetting fraud "may well be a valid cause of action in Florida").  Florida courts have presumed that a tort claim for aiding and abetting fraud has three elements: (1) the existence of "an underlying fraud"; (2) that "[t]he defendant had knowledge of the fraud"; and (3) that the defendant "provided substantial assistance to advance the commission of the fraud."  *Id.* at 372.  The district court concluded that the Bank was entitled to summary judgment because Freeman had failed to come forward with evidence the Bank knew of the fraud or had provided substantial assistance.[7]  We disagree.  As we explained above, Freeman came forward with sufficient evidence establishing that the Bank knew about the fraud.

Regarding the substantial assistance element, Freeman offered sufficient evidence to establish the Bank provided substantial assistance to advance the commission of the fraud.  "Substantial assistance occurs when a defendant

---

[7] It is undisputed that there was an underlying fraud.

affirmatively assists, helps conceal[,] or fails to act when required to do so, thereby enabling the breach to occur." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) (internal quotation marks omitted).  Mere inaction "constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Id.* (internal quotation marks omitted).  Because "banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled," a bank's inaction—that is, its failure to stop the theft of such trust funds—can constitute substantial assistance. *Id.*; *see In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (explaining that a bank's performance of ordinary business transactions for a customer "can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort"  (internal quotation marks omitted)).  Put another way, to establish that a bank substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud "is the crucial element." *In re First Alliance Mortg. Co.*, 471 F.3d at 995 (internal quotation marks omitted).

Here, a reasonable jury, viewing the evidence in the light most favorable to Freeman, could find that the Bank provided substantial assistance through its inaction.  The Bank (through Padgett-Perdomo) knew that OPT Title was holding the funds in escrow and about Gordon's ongoing fraud.  Under these

18

circumstances, a reasonable jury could find that the Bank's failure to warn

Freeman or to stop Gordon's fraud constituted substantial assistance. *See Lerner*,

459 F.3d at 295. Because Freeman came forward with evidence to establish the

essential elements of his aiding and abetting fraud claim,[8] the district court erred in

granting summary judgment to the Bank.[9]

## IV.    CONCLUSION

For the reasons set forth above, we reverse the district court's order granting

summary judgment to the Bank and remand the case for further proceedings

consistent with this opinion.

**REVERSED AND REMANDED.**

---

[8] For the same reasons, the district court erred in granting summary judgment on Freeman's aiding and abetting conversion claim. The parties implicitly concede that Freeman's aiding and abetting conversion claim rises or falls with his aiding and abetting fraud claim.

[9] The Bank argues in the alternative that we should affirm the district court because Freeman loaned money to Sharpe Resources at a usurious rate of interest. But the Bank may not assert a usury defense in this case because, as Florida courts have explained, "usury is purely a personal defense" that belongs to the borrower, here, Sharpe Resources. *Gunn Plumbing, Inc. v. Dania Bank*, 252 So. 2d 1, 4 (Fla. 1971); *see Wulsin v. Palmetto Fed. Sav. & Loan Ass'n*, 507 So. 2d 1149, 1150 (Fla. Dist. Ct. App. 1987). The Bank, which was not a party to the loan agreement, cannot raise the affirmative defense. *See Drill S., Inc. v. Int'l Fid. Ins. Co.*, 234 F.3d 1232, 1238 n.9 (11th Cir. 2000) (discussing that third party may not raise personal defenses).