DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ALAN GILISON** and **SUSAN GILISON,**
Appellants,

v.

**FLAGLER BANK,** a Florida Financial Institution,
Appellee.

No. 4D19-3379

[August 26, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 502017CA012551XXXXMB.

Jeffrey B. Shalek and Gary S. Phillips of Phillips, Cantor & Shalek, P.A., Hollywood, for appellants.

Richard S. Cohen, West Palm Beach, and Marjorie Gadarian Graham, Palm Beach Gardens, for appellee.

MAY, J.

The plaintiffs appeal an order dismissing two counts of their Fifth Amended Complaint with prejudice for failure to state a cause of action. They argue the court erred in this ruling because they sufficiently alleged claims for: (1) aiding and abetting fraud; and (2) conspiracy to commit fraud. We agree and reverse.

The plaintiffs' claims arose from loans they made to Chariots of Palm Beach, Inc. ("Chariots"), a retail seller and renter of luxury cars. The plaintiffs alleged that when Chariots filed for bankruptcy, they became aware of Chariots' fraud with regard to their loans.[1] The plaintiffs alleged Flagler Bank ("bank"), Chariots' second largest floor plan lender, aided and abetted the fraud and conspired to commit fraud.

Chariots' accountants, Mackail & Sterling CPA's and Associates, P.A., prepared Chariots' accounting books and records and the necessary tax

---

[1] Chariots is not a party due to the pending bankruptcy.

documents for Chariots' lenders. Ron Mackail and Edward Sterling were both on the bank's board of directors. In fact, Sterling served as the bank's CEO and President.

Chariots utilized a floor plan financing program, a typical method used to acquire inventory. Money is borrowed against each car in inventory and the lender either holds title or secures the loan with a UCC-1 financing statement. Over the years, the plaintiffs financed vehicles for Chariots. As security, Chariots provided the plaintiffs with the original title to each car. Purportedly, Chariots could not sell a car unless it obtained the title from the plaintiffs, which occurred when the car's loan was paid off.

In 2016, Chariots paid the plaintiffs $409,511.81 in interest. However, Chariots' final balance sheets prepared by the accountants showed a total liability of only $598,000, much smaller than would account for the large interest payment. A staff member of the accounting firm flagged this discrepancy and notified Mackail. The lienholder records indicated a reduced amount owed to the plaintiffs and noted "8/6/14 per Hugh Bate—never provided documentation."

Meanwhile, Chariots obtained duplicate titles from the Florida Department of Motor Vehicles for the cars financed by the plaintiffs. It would then sell the cars and collect the purchase money, but did not pay the plaintiffs. Instead, Chariots paid the bank's loan with the plaintiffs' money. It kept the plaintiffs' secured cars on the bank's floor plan inventory list and obtained multiple loans on a single vehicle. Sixty days before Chariots filed for bankruptcy, it paid the bank $2,527,952.03.

In the two counts against the bank, the plaintiffs alleged claims for: (1) aiding and abetting fraud; and (2) conspiracy to commit fraud. They alleged the accountants and the bank maneuvered critical funding to Chariots so that it would appear solvent for as long as possible to attract investors.

The complaint further alleged the accountants failed to engage in generally accepted accounting principles, which allowed the bank to receive the funds owed to the plaintiffs. Lastly, the complaint alleged the accountants and bank knew Chariots' modus operandi and substantially assisted Chariots' owner and Chariots by maneuvering critical funding into the scheme while hiding the wrongdoing.

The bank moved to dismiss the complaint, arguing the plaintiffs failed to state a cause of action. As to the aiding and abetting fraud claim, the bank argued the plaintiffs failed to allege the bank knew of the fraud. As

to the conspiracy to commit fraud claim, the bank argued it did not perform an overt, unlawful, or lawful act by unlawful means.

The trial court granted the motion with prejudice for failure to state a cause of action, finding the plaintiffs "failed to allege the bank had actual knowledge of the fraud and the bank owed no fiduciary duty to the [p]laintiffs." From this order, the plaintiffs now appeal.

A ruling on a motion to dismiss for failure to state a cause of action is reviewed *de novo*. *Regis Ins. Co. v. Miami Mgmt.*, 902 So. 2d 966, 968 (Fla 4th DCA 2005).

- ### *The Aiding and Abetting Fraud Claim*

The plaintiffs argue the trial court erred in finding the complaint failed to allege the bank's knowledge of the fraud. They contend the complaint sufficiently alleged the bank's CEO and president and a member of its board of directors, who were also Chariots' accountants, knew of the fraud. The bank responds the plaintiffs failed to plead the bank had actual knowledge. We agree with the plaintiffs.

To successfully plead the claim of aiding and abetting fraud, the plaintiffs must allege the: (1) existence of the underlying fraud; (2) knowledge of the fraud; and (3) the defendant provided substantial assistance to the commission of the fraud. *ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005).

### 1) The Complaint Alleged an Underlying Fraud.

An underlying fraud exists when the defendant makes a false statement concerning a material fact. *Ramel v. Chasebrook Constr. Co.*, 135 So. 2d 876, 881 (Fla. 2d DCA 1962). The defendant must know the statement to be false, have the intention to induce the plaintiff to rely upon the representation, and in reliance on that representation the plaintiff will suffer an injury. *Id.* "[A] statement of a party having exclusive or superior knowledge may be regarded as a statement of fact. . . ." *Id.* at 879.

Here, the bank had superior knowledge through the accountants that Chariots' books contained fraudulent misrepresentations. The accountants, one of whom also served as the bank's President and CEO and another as a board member, prepared Chariots' balance sheets. The plaintiffs alleged through them the bank knew the books contained inaccurate and fraudulent information.

3

Since 2011, the accountants reported 1099-INT income to the plaintiffs in excess of $300,000 per year. But Chariots' books reflected a significantly smaller debt than would support those interest payments. An employee of the accounting firm flagged the discrepancy and notified Mackail, a principal of the accountants and CEO of the bank. The discrepancy remained on Chariots' books without proper documentation.

The complaint alleged the plaintiffs relied on Chariots' representation that it could sell the cars it financed only after Chariots paid off their loan. It alleged the bank knew through the accountants that Chariots obtained duplicate titles for those cars. The plaintiffs' reliance on this representation caused them injury when Chariots paid the bank money owed to them.

In short, the plaintiffs alleged an underlying fraud.

### 1) The Complaint Alleged the Bank's Knowledge of the Underlying Fraud.

A defendant has knowledge of an underlying fraud if it has a general awareness that its role was part of an overall improper activity. *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985). Knowledge can be imputed on a corporation when the plaintiff demonstrates, "without dispute, that a corporate officer's fraud intended to and did benefit the corporation, to the detriment of" the plaintiff. *Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. 3d DCA 1992) (imputing knowledge onto corporation where its managing officer knew about the ongoing fraud and the corporation obtained a benefit from the managing officer's fraudulent conduct).

Here, the complaint alleged the bank had general knowledge of Chariots' scheme because the bank was the only lender that had direct access to Chariots' financial records and the discrepancies within them. The accountants prepared Chariots' final balance sheets, which reflected Chariots' debt to the plaintiffs of $598,000 in 2016. However, the 2016 1099-INT, prepared by the accountants, reflected Chariots' payment to the plaintiffs of $409,511.18 in interest. Simply put, the numbers did not add up.

The complaint alleged the accountants were on the bank's board of directors; one served as the bank's CEO and President while another was a board member. They had control over the bank. The bank advanced funds to Chariots, giving it the appearance of a stronger financial condition than existed. This allowed Chariots to prolong the life of its scheme. The

bank benefited when Chariots made substantial interest payments to the bank while the plaintiffs' loans remained unpaid.

The plaintiffs sufficiently alleged the bank had knowledge of the underlying fraud.

### 3) *The Complaint Alleged the Bank Provided Substantial Assistance.*

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the breach to occur." *Chang v. JP Morgan Chase Bank, N.A.*, 845 F. 3d 1087, 1098 (11th Cir. 2017) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)). "Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001), *accord Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1129 (C.D. Cal. 2003).

Here, the complaint alleged the bank assisted Chariots by leading the plaintiffs to believe their loans were properly documented on Chariots' books and records. The complaint alleged the bank concealed that Chariots obtained duplicate titles for cars financed by the plaintiffs. This allowed Chariots to collect the purchase money for the cars and pay the bank without paying the plaintiffs.

In *Neilson*, the banks gave the primary party of the scheme access to large sums of money that kept a scheme afloat for a significant time. *Id.* at 1108–09. Without the bank's assistance, the Ponzi scheme could not have succeeded. *Id.* at 1110. The court held that the bank's participation was a substantial factor in bringing about the plaintiffs' alleged injury. *Id.* at 1129. The same is true here.

The complaint sufficiently alleged an underlying fraud, the bank's knowledge of it, and its substantial assistance in its commission, the requisite elements of a claim for aiding and abetting fraud. Taken as true, these allegations withstood the bank's motion to dismiss.

- ### *The Conspiracy to Commit Fraud Claim*

The plaintiffs next argue the trial court erred in finding the complaint failed to allege a cause of action for conspiracy because it alleged the bank agreed to and participated in the underlying fraud. The bank responds that the allegations are conclusory and fail to allege what overt acts the

bank performed in furtherance of, and how the bank assisted in, the fraud. We once again agree with the plaintiffs.

To state a claim for civil conspiracy, a plaintiff must allege: (1) an agreement between two or more parties, (2) to do an unlawful act or to do lawful act by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) damage to the plaintiff as a result of the act performed in furtherance of it. *Walters v. Blankenship,* 931 So. 2d 137, 140 (Fla 5th DCA 2006).

An agreement between two or more parties occurs when there is an express or implied agreement of two or more persons to engage in a criminal or unlawful act. *Charles v. Fla. Foreclosure Placement Ctr., LLC.,* 988 So. 2d 1157, 1160 (Fla. 3rd DCA 2008) (quoting *Witmer v. Dep't of Bus. & Prof'l Regulation Div. of Pari-Mutuel Wagering,* 631 So. 2d 338, 342 (Fla. 4th DCA 1994)).

Here, the complaint alleged the bank had an implied agreement with Chariots to deceive the plaintiffs. The accountants prepared inaccurate books for Chariots; the bank knew that Chariots' books were inaccurate because Chariots' accountants were on the bank's Board of Directors. This allowed Chariots to secure additional loans from the plaintiffs.

A conspirator only needs to know of the scheme and assist in it in some way to be held responsible for all the acts of his conspirators. *Charles,* 988 So. 2d at 1160; *MP, LLC v. Sterling Holding, LLC,* 231 So. 3d 517 (Fla. 3d DCA 2017) (when pleading an overt act in furtherance of a conspiracy, there is no requirement that each co-conspirator commit acts in furtherance of the scheme).

The complaint alleged the bank assisted Chariots in the fraud because the bank's underwriters approved additional funds to Chariots. The additional funds gave Chariots the appearance of a strong financial condition. That appearance allowed Chariots to prolong the existence of its scheme. This ultimately allowed the bank to recover a large share of its debt from Chariots by receiving payments due the plaintiffs.

Those allegations were sufficient for the conspiracy claim to survive the bank's motion to dismiss. *See Charles,* 998 So. 2d at 1160.

We need not address the issue of whether the dismissal should have been with prejudice in light of our holding. We reverse and remand the case to the trial court for further proceedings consistent with this opinion.

*Reversed and Remanded.*

WARNER, J., and HILAL, JENNIFER, Associate Judge, concur.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***